# EXHIBIT 1

DAS:KKO
F. #2009R00637

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA.

- - - - - - - - - - - - - - - - - - X

IN THE MATTER OF THE APPLICATION OF          TO BE FILED UNDER SEAL
THE UNITED STATES OF AMERICA FOR A
SEARCH WARRANT FOR THE PREMISES              AFFIDAVIT IN SUPPORT OF
KNOWN AND DESCRIBED AS 8902 SAWDUST          APPLICATION FOR SEARCH
TRAIL, CHESTERFIELD, VIRGINIA                WARRANT

- - - - - - - - - - - - - - -          - - - X

EASTERN DISTRICT OF VIRGINIA, SS:

                 BRENTON EASTER, being duly sworn, deposes and says that

he is a Special Agent with United States Immigration and Customs

Enforcement, duly appointed according to law and acting as such.

                 Based on information and belief, there is probable

cause to believe that there will be found in THE PREMISES KNOWN

AND DESCRIBED AS 8902 SAWDUST TRAIL, CHESTERFIELD, VIRGINIA

(hereinafter "THE SUBJECT PREMISES"), further described in Rider

A, the things described in Rider B, which constitute evidence,

fruits and instrumentalities of (1) entry of goods by means of

false statements, contrary to Title 18, United States Code,

Section 542; (2) smuggling goods into the United States, contrary

to Title 18, United States Code, Section 545, and (3)

international money laundering to promote smuggling, contrary to

Title 18, United States Code, Section 1956.

1

KHOUL I000003594

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.  I have been a Special Agent with the Department of Homeland Security Investigations and Immigration and Customs Enforcement ("DHS") for approximately six years. During my time as a Special Agent, I have been assigned to a unit responsible for investigating, among other things, cultural property crimes, intellectual property crimes, counterfeiting and money laundering. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2.  I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, including statements made to me and my review of documents and records that have been obtained consensually, pursuant to Customs summonses, subpoenas or search warrants, and from government databases; (b) reports made to me by other law enforcement authorities, and

---

[1] Because the purpose of this Affidavit is solely to set forth probable cause to search, I have not set forth all facts concerning this investigation of which I am aware.

2

KHOUL I 000003595

ᵒ) information obtained from confidential sources of information. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. All assertions as to dates, times, and numbers are approximate and are based upon information and evidence that has been gathered to date in the investigation.

3. DHS is investigating the unlawful smuggling of cultural property from the United Arab Emirates into the United States.

4. On May 4, 2011, a grand jury in the Eastern District of New York returned a sealed indictment in the matter of United States v. Mousa Khouli, et al., Criminal Docket No. 11-340 (ERK) ("Khouli"). The indictment charges four defendants -- Mousa Khouli, also known as "Morris Khouli," Salem Alshdaifat, Joseph A. Lewis II and Ayman Ramadan -- with conspiring to smuggle and smuggling Egyptian antiquities into the United States, among other charges. Specifically, the indictment alleges that the defendants smuggled the following items into the United States: (1) a Greco-Roman style Egyptian coffin, (2) a three-piece nesting Egyptian coffin set, (3) Egyptian funerary boats, and (4) Egyptian limestone figures. The indictment contains forfeiture allegations as to all of these items.

3

5. Parts of the three-piece nesting Egyptian coffin set have already been seized. This application sets forth the probable cause to believe that the remaining smuggled pieces will be found at the SUBJECT PREMISES. For that reason, the information in this application concerning these items is limited to evidence demonstrating that these items were smuggled and is not based on proof of the criminal knowledge of defendant Lewis, the owner of the SUBJECT PREMISES. The government need not establish Lewis's knowledge of the contraband nature of the items for purposes of this application. See United States v. Doyle, -- - F.3d ----, 2011 WL 1957677, at *9 (4th Cir. May 23, 2011)(quoting Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978) for the axiom that "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought").

BACKGROUND ON CUSTOMS REQUIREMENTS

6. Shipments of goods arriving at the ports of the United States must be granted "entry," or clearance, by the Department of Homeland Security, Customs and Border Protection ("Customs" or "CBP"), prior to the goods being allowed to enter the commerce of the United States. The importer of a shipment of goods may obtain such clearance through the use of a "Customs

4

KHOULI000003597

Broker." A Customs Broker is an individual or company licensed by Customs to file entry documents for commercial shipments. The importer (or agent of the importer) presents the Customs Broker with certain documents describing the shipment; the Customs Broker generates an entry package from these documents and provides them to Customs in order to obtain clearance for the goods to enter the United States.

7. Statutes and regulations governing the importation process, including but not limited to Title 18, United States Code, Sections 541 and 542, and Title 19, United States Code, Section 1592, require persons bringing merchandise into the United States to provide truthful and complete statements to Customs about the merchandise.

8. Some merchandise can also enter the United States via an "informal entry." Informal entries are permitted for goods meeting certain criteria, including a value of $2,000 or less. No Customs Broker or entry forms are required for an informal entry. The importer must, however, accurately list the contents of the package, country of origin, and the value of the contents on a shipping label.

9. Based on the information provided in a Customs Broker's entry package or, for an informal entry, a shipping label, Customs may clear a particular shipment without inspecting it. Indeed, the large volume of cargo arriving at the ports each

5

day prohibits Customs from examining every container or shipment prior to Customs release. Customs will target certain containers and air shipments for review and, on some occasions, will randomly examine air shipments. If and when Customs clears a shipment based on documents provided by a Customs Broker, Customs informs the Customs Broker who, in turn, informs the importer that the shipment has been cleared. After a shipment is cleared, it may be removed from the port and delivered to the importer or consignee. For informal entries, if and when Customs clears a shipment, the carrier for the package (for example, an express mail service) resumes possession of the package and delivers it to the addressee.

## BACKGROUND ON SMUGGLING CULTURAL PROPERTY

10. Based on my experience, training and discussions with other agents investigating crimes such as smuggling, importing and trafficking in stolen and potentially stolen cultural property, persons who smuggle cultural property of questionable provenance into the United States typically avoid detection by Customs by means of false statements regarding the contents, value and countries of origin of their shipments. In particular, they avoid listing countries of origin such as Egypt whose patrimony laws restrict the ownership and exportation of cultural property. Importation of cultural property into the United States in violation of a foreign country's patrimony law

6

KHOULI000003599

violates the National Stolen Property Act, codified at Title 18, United States Code, Section 2315. See United States v. Schultz, 333 F.3d 393, 410 (2d Cir. 2003). Further, falsely declaring to Customs the country of origin of cultural property that may be subject to a foreign claim of ownership constitutes a material false statement under Title 18, United States Code, Section 542, where the declared country of origin does not have cultural patrimony laws. See United States v. An Antique Platter of Gold, 991 F. Supp. 222, 230 (S.D.N.Y. 1997), aff'd, 184 F.3d 131, 137 (2d Cir. 1999)(finding such misstatements material as a matter of law). An importer who uses entry documentation bearing a false country of origin "without reasonable cause to believe the truth of such statement" is guilty of a crime under Section 542. 18 U.S.C. § 542. An importer who knowingly imports goods or receives imported goods contrary to Section 542 also violates Title 18, United States Code, Section 545. 18 U.S.C. § 545 (criminalizing the knowing importation of merchandise "contrary to law" or knowing receipt of such merchandise).

### LEWIS's Egyptian Antiquities Collection Is Housed at the SUBJECT PREMISES

11. Joseph A. Lewis II ("Lewis") works in the pharmaceutical industry and is a collector of Egyptian antiquities through his company, EA Investments LLC ("EA Investments"). Lewis resides at the SUBJECT PREMISES.

7

12.   Homeowner's insurance records obtained from Chartis Property Casualty Co. in June 2011 describe the SUBJECT PREMISES as "'museum-like', with Egyptian antiquities" and other collections.  These records further state, "Mr. Lewis advised there are $5m+ in Egyptian art (some on loan to the Boston Museum of Fine Art, and the Carlos Museum, Atlanta, GA) . . . ."  The records also include a "customized report" prepared by AIG Private Client Group describing the SUBJECT PREMISES.  The customized report includes photographs of the SUBJECT PREMISES, including Lewis's "Egyptian Artifacts (Collection)."  It also includes a floor plan for the SUBJECT PREMISES.  Based on the homeowner's insurance records described above, I believe that Lewis maintains his Egyptian antiquities collection in his home, except for pieces that are on loan to museums.

13.   The insurance records include a "Collections" policy issued to EA Investments in care of Lewis at the SUBJECT PREMISES (the "Lewis Collections Insurance Policy").  The current Collections policy is effective through December 2011.  Attached to the Collections policy is a Schedule of Items (the "Insurance Schedule") dated March 30, 2011 which includes the following information about items in Lewis's collection:

a.   "Greco-Roman Period Wood Coffin" acquired from "Windsor" on March 5, 2009 and insured for $32,500 (item no. 174; control no. 90301);

8

b. "25th Dynasty Coffin" acquired from Windsor on April 13, 2009 and insured for $153,000 (item no. 172; control no. 90402);

c. "Two MK Wood Boat Models" acquired from Windsor on May 11, 2009 and insured for $55,000 (item no. 166; control no. 90505);[2] and

d. "Five MK Limestone Figures" acquired from Windsor on May 11, 2009 and insured for $4,000 (item no. 165; control no. 90506).

## LEWIS's Egyptian Antiquities Collection Contains Smuggled Contraband

14. In the course of this investigation, I have reviewed customs records, bank records, and e-mail records,[3] among other materials. Based on my review of this evidence, I believe that the (1) "Greco-Roman Period Wood Coffin", (2) "25th Dynasty Coffin", (3) "Two MK Wood Boat Models" and (4) "Five MK Limestone Figures" were smuggled into the United States by a New York antiquities dealer named Mousa Khouli, owner of Windsor Antiquities ("Windsor"), together with Salem Alshdaifat, an antiquities dealer located in Michigan, and Ayman Ramadan, an

---

[2]   Based on my training, experience and knowledge of this investigation, I believe that "MK" stands for "middle kingdom" and relates to a historical period in ancient Egypt.

[3]   The e-mail records were obtained via three search warrants authorized by U.S. Magistrate Judges in the Eastern District of New York.

9

KHOULI000003602

antiquities dealer based in Dubai, United Arab Emirates ("UAE"). I further believe that as to each item, Lewis was the ultimate purchaser. As noted above, Khouli, Alshdaifat, Ramadan and Lewis are defendants in the sealed indictment in Khouli.

I.   The Smuggling of the "Greco-Roman Period Wood Coffin"

15.   As noted above, Lewis's Insurance Schedule includes an entry described as "Greco-Roman Period Wood Coffin" acquired from Windsor on March 5, 2009, and insured for $32,500. Bank records confirm that Lewis used a check drawn on EA Investments' checking account with People's Bank of Virginia to pay Windsor for a Greco-Roman style Egyptian coffin. The check was written in the amount of $32,500 and was dated March 5, 2009. The memo on the check stated, "Egyptian coffin." As discussed below, customs paperwork and e-mail records show that this coffin was smuggled into the United States.

The Sale and Smuggling of the Greco-Roman Coffin

16.   In late October 2008, Khouli purchased a Greco-Roman style coffin from Ramadan (the "Greco-Roman Coffin"). In e-mail correspondence, Khouli and Ramadan described the Greco-Roman Coffin as "large" and "complete."

17.   The e-mail correspondence further shows that Ramadan shipped what he described as the "big sarcophagus" to Khouli on or before November 16, 2008. Ramadan advised Khouli by e-mail that the shipper tracking number for the Greco-Roman

10

Coffin was 3293 (the "Tracking Number"). After learning that the Greco-Roman Coffin was shipped, Khouli wired $3,400 from his New York bank account to Ramadan's Dubai bank account.

18. On November 20, 2008, Khouli's customs broker filed entry paperwork under entry number H67-1324607-1 for an item shipped using the Tracking Number (the "November 2008 shipment"). The entry paperwork described the November 2008 shipment as "antique wood panel[s]," whose country of origin was the UAE, and which was being shipped to Windsor via John F. Kennedy Airport in Queens, New York. The "merchandise processing fee" was listed as $3,400, the same amount Khouli wired to Ramadan.

## KHOULI'S FALSE STATEMENTS

19. On or about February 10, 2009, I personally visited Windsor's gallery in Manhattan and interviewed Khouli. I advised Khouli that I was investigating the November 2008 shipment and showed him a CBP Automated Targeting System ("ATS") database printout listing the November 2008 shipment's entry information which described the cargo as "wood panels." Khouli then showed me five old, painted wood panels. Khouli also stated that the panels were Egyptian and admitted that while he often imported items from the UAE, nothing in his gallery originated in the UAE. Based on my training, experience and knowledge of this investigation, smugglers of cultural property from countries like

11

Egypt which have strong patrimony laws and treaties that protect their cultural property, often falsely declare shipments of such property as originating in countries without such laws, like the UAE.

20.  After the interview, law enforcement obtained a copy of Khouli's e-mail through a judicially authorized search warrant.  A review of these e-mails revealed that the November 2008 shipment contained the Greco-Roman Coffin, not five painted wood panels.  The same e-mails showed that the wood panels Khouli showed me as part of the November 2008 shipment included a panel that Khouli had offered for sale as early as December 27, 2007, almost a year earlier.  I therefore believe that Khouli's statements to me concerning the November 2008 shipment were false and that the November 2008 shipment in fact contained the Greco-Roman Coffin.

## PHOTOGRAPHS OF THE GRECO-ROMAN PERIOD COFFIN

21.  In October 2008, while Khouli was negotiating the purchase and shipping of the Greco-Roman Coffin with Ramadan, Khouli e-mailed pictures of the Greco-Roman Coffin to Noor Shams, another antiquities dealer in Dubai, UAE (the "Shams E-mail").  In the Shams E-mail, Khouli asked how much Shams's friend would charge him to "make an invoice" for the item.  Khouli described the Greco-Roman Coffin as 186 cm tall, which corresponds to approximately 73 inches.  Based on my training, experience and

12

knowledge of this case, I believe that Khouli was concerned about the logistics of importing a large Egyptian sarcophagus and was seeking another antiquities dealer who would create a false invoice and serve as the exporter on the shipping paperwork. Shams ultimately declined to provide Khouli with a false invoice.

22. Khouli's e-mail correspondence further shows that immediately after making the false statement to me on February 10, 2009, set forth above, he set to work to sell the Greco-Roman Coffin. On February 11, 2009, an antiquities dealer named Jamal Rifai sent Khouli an e-mail attaching 15 photographs (the "Rifai E-mail"). Based on my review of the e-mail, the coffin pictured in the attachments to the Rifai E-mail appear to be the Greco-Roman Coffin pictured in the Shams E-mail attachments. Twelve minutes after receiving the pictures from Rifai, Khouli sent an e-mail with 15 attachments to Lewis and advised Lewis that he had a coffin that is very large. He noted that the coffin was 74 inches tall, similar to the dimensions that Khouli described in the Shams E-mail.[4] Subsequent e-mails show that by March 4, 2009, Khouli and Lewis had agreed on a price of $32,500 for the Greco-Roman Coffin.

---

[4] The width and height dimensions supplied in the Rifai e-mail (18-20 inches and 24 inches) differ slightly from those supplied in the Shams e-mail (approximately 15 inches and approximately 20 inches). In light of the conversion from centimeters to inches and the fact that the pictures attached to those e-mails show the same coffin, I do not believe that these differences are material.

13

KHOULI000003606

23. In light of the foregoing facts, I believe that the Greco-Roman Coffin was smuggled into the United States from the UAE in November 2008 by making false statements in Customs entry paperwork. Specifically, the entry papers contain the following false statements: (1) the ancient Egyptian coffin was falsely described as "antique wood panel[s]" and (2) the country of origin was falsely listed as the UAE, not Egypt. Further, I believe that Khouli made false statements to me about the contents of the November 2008 shipment and then immediately made efforts to sell the actual contents of the shipment -- the Greco-Roman Coffin -- to distance himself from the evidence of his smuggling.

24. I believe that based on the photographs and measurements of the coffin in Khouli's e-mail correspondence and the timing of the sale to Lewis following my inquiry into the November 2008 shipment, that the coffin Khouli sold to Lewis is the Greco-Roman Coffin. I further believe based on Khouli and Lewis's e-mail correspondence setting the price of the Greco-Roman Coffin at $32,500 by March 4, 2009, that the Greco-Roman Coffin is the same one described in the Insurance Schedule as a "Greco-Roman Period Wood Coffin" acquired from Windsor on March 5, 2009, and insured for $32,500. In addition, because Lewis's insurance company identified the insured items in the collection as being located at the SUBJECT PREMISES in museum-like custom

14

cabinetry display cases (see Rider A for examples), there is
probable cause to believe that the Greco-Roman Period Wood Coffin
is likely to be found at the SUBJECT PREMISES and should be
seized as smuggled contraband and evidence of criminal conduct.

II.  The Smuggling of Pieces of a Nesting Egyptian Sarcophagus
     Set

     25.  As noted above, Lewis's Insurance Schedule
includes an entry described as "25th Dynasty Coffin" acquired
from Windsor on April 13, 2009, and insured for $153,000.  As
discussed below, e-mail and bank records confirm that on April
13, 2009, Lewis paid $150,000 toward a three-piece set of
Egyptian sarcophagi located in Dubai, UAE and that pieces of this
set were smuggled into the United States.  These records further
show that Khouli served as the intermediary between Lewis and the
dealers selling the coffins.

     26.  On April 1, 2009, Khouli forwarded photographs of
a two-piece sarcophagus set to Lewis by e-mail, writing "i [sic]
was just offered this unbelievable piece I thought you might be
interested.  the size is 220cm long what a large piece the whole
set is there it is hard to come by these days."[5]  The coffin
pictured in the attachments consisted of an anthropoid shaped
coffin (the "Middle Coffin") and a domed coffin lid with four

_____

     [5]  Khouli regularly used lower case instead of the correct
upper case in many of his emails.  The grammatically incorrect
lower case letters contained in emails set forth in this
affidavit are direct quotes from the original emails.

15

KHOULI000003608

wooden birds sitting on the four corners of the lid (the "Outer Coffin Lid").

27. By April 3, 2009, Khouli had wired $20,000 to Ramadan's bank account in Dubai to pay for the two-piece set.

28. On April 4, 2009, Khouli sent an e-mail to Lewis stating, "I am on my [way] to arrange for shipping the item I will call you when I get back Wednesday. I sent them the money before I left all good to go. Just hoping when you have a chance to send me a deposit and when the piece arrive will worry about the rest." Khouli's travel records show that Khouli traveled to Dubai that day and returned on April 8, 2009.

29. On April 8, 2009, Khouli sent an e-mail to Lewis that stated, "I just got back[.] the item is unbelievable beautiful wow I was shocked when I saw it[.] it is gonna cost a lot [of] money by the time I get it here[.] however, I asked them if there was a third coffin with it but they said no that is it." Khouli's e-mail to Lewis continued, "I was offered another coffin real nice as well[.] they want $75k for it but it has a little retouching here and there[.] I love [it.] I thought you might be interested[.] take a look at the images and let me know." Attached to the e-mail were images of an anthropoid coffin which had some features in common with the larger anthropoid coffin pictured in the April 1, 2009 e-mail (the "Inner Coffin").

16

KHOULI000003609

30. Later that day, Khouli sent another e-mail to
Lewis that stated, "I think they may have sold it." Khouli
followed-up with another e-mail to Lewis two hours later stating,
"Sorry but it got sold there is nothing I could do."

31. On the same day, Lewis sent a reply e-mail to
Khouli, asking Khouli to beg the sellers not to break up the set.
Based on my training, experience and knowledge of this
investigation, I believe that Lewis believed that the Inner
Coffin was part of a three-piece coffin set along with the Middle
Coffin and Outer Coffin Lid, in which the Inner Coffin fit inside
the Middle Coffin and the Outer Coffin Lid. Khouli replied by e-
mail that the sellers wanted $150,000 for the Inner Coffin.
Lewis responded by e-mail:

> I still really want this inner coffin to
> complete the set. Let[']s wait until next
> week before re-contacting them about this
> item. If you were just there, I'm sure they
> still have it. Of course, I will take just
> the original two but having this third inner
> coffin really would be nice and I will pay
> more than 75K to get this coffin - 150 K is
> too much but somewhere in between is OK.
> Maybe we should just contact the "buyer"
> about reselling this item to us for a quick
> profit, think about it.

32. On April 9, 2009, Khouli advised Lewis by e-mail
that he was successful in getting the "third piece" for $150,000
and instructed Lewis to wire the money to his London HSBC
account.

17

KHOULI000003610

33. On April 10, 2009, Lewis responded by e-mail, that he would "wire [Khouli] 150 K on Monday to [Khouli's] London bank account. Will send confirmation after the wire. This deal really stretches my finances, but I'm making it work, Ouch! for that 3rd coffin, its quite a bit more than its actually worth, but acquiring the whole set was very important to me . . . ." Based on e-mail correspondence, the total price Lewis agreed to pay for the three nesting coffins was $310,000.

34. On April 12, 2009, Lewis e-mailed Khouli confirming the details of the sale of the three-piece nesting sarcophagus set. The terms included that Khouli would provide "[p]rovenance from [his] late father's collection, Israel 1960s; [Khouli has] therefore established, to the best of [his] knowledge, these items have not been illegally obtained from an excavation, architectural monument, public institution or private property" and a guarantee that the items would be cleared by Customs within 30 days of arrival. I believe that Lewis's reference to Customs clearance confirms his knowledge that the coffins were being shipped from overseas. Because Lewis was advised that the coffins were abroad that Khouli was negotiating with the "sellers" on Lewis's behalf, I believe that Lewis knowingly requested a false provenance when he asked Khouli to provide a provenance from his father's collection in Israel.

18

KHOULI000003611

35. On April 13, 2009, bank records show that Lewis wired $150,000 from his EA Investments account at People's Bank of Virginia to Khouli's HSBC account in London, England. Lewis attached the wire transfer request to an e-mail to Khouli and wrote, "Also, one other condition as usual, this transaction is 100% confidential between you and me, not to be discussed with any third parties." April 13, 2009, was the acquisition date listed in Lewis's insurance schedule for the "25th Dynasty coffin" Lewis obtained from "Windsor" and insured for "$150,000."

36. In the course of this investigation, the Inner Coffin was seized during a consensual search of Khouli's residence in September 2009. In addition, the Middle Coffin and the domed top of the Outer Coffin Lid were seized in November 2009 after being smuggled into the Port of Newark, secreted inside a container of Indian furniture. The remaining portions of the Outer Coffin Lid, consisting of four boards and posts that form the base of the Outer Coffin Lid and four decorative wooden birds (the "Remaining Portions"), have not been recovered by law enforcement authorities.[6] As part of a set valued at $310,000,

---

[6] During a February 2010 search of Khouli's gallery, DHS agents found a December 3, 2009 letter from Lewis's counsel to Khouli requesting return of $153,500. This amount represented Lewis's $150,000 deposit on April 13, 2009, for a "three piece coffin set" and subsequent payment of $3,500 toward restoration. In the letter, Lewis's attorney directed that Khouli return this money because he was "unable to deliver the pieces." However, it is not clear from this letter that Khouli did not ship the Remaining Portions to the SUBJECT PREMISES either before or after

19

the Remaining Portions should have been declared to Customs as part of the overall importation by Khouli. No such Customs entry was filed. These items therefore constitute smuggled contraband and evidence of criminal conduct, including international money laundering in violation of Title 18, United States Code, Section 1956(a)(2)(A). Because the Remaining Portions were not found during DHS searches of Khouli's residence in September 2009 and gallery in September 2009 and February 2010, and because Lewis continues to insure this purchase under a collections insurance policy which states that insured items are located at the SUBJECT PREMISES, there is probable cause to believe that Lewis received the Remaining Portions and is holding them at the SUBJECT PREMISES as part of his insured collection.

III. The Smuggling of the Funerary Boats and Limestone Figures

37. As noted above, Lewis's Insurance Schedule includes entries for "Two MK Wood Boat Models" and "Five MK Limestone Figures" (item nos. 165-66; control nos. 90505-06) acquired from Windsor on May 11, 2009, and insured for a total of $59,000. As set forth below, e-mail records confirm that Khouli sold two ancient Egyptian funerary boats and a set of limestone

---

December 3, 2009, as a good faith gesture to Lewis, or to hide evidence of smuggling. Indeed, by December 2009, Khouli was aware that Customs was seizing the Inner Coffin, Middle Coffin and part of the Outer Coffin Lid.

KHOULI000003613

figures to Lewis in early May 2009 and that these items were smuggled into the United States by post.

38. On May 5, 2009, Salem Alshdaifat e-mailed Khouli and offered to sell him a set of Egyptian boats and limestone figures. Alshdaifat wrote, "The boats are from [the] Late 1st intermediate / early 11th dynasty and so are the statues. The statues text reads 'The lectorpriest Chnumhotep." Khouli forwarded the photographs to Lewis on the same day, writing, "I just offered this great group[.] I will explain() to you when I see you this afternoon." Khouli included Alshdaifat's description in his e-mail to Lewis.

39. On the same date, Alshdaifat e-mailed Khouli an invoice stating that Holyland Numismatics sold "Ancient Egyptian Boats and lime stone Figures" to Windsor for $40,000. Alshdaifat included wire information for his Comerica bank account.

40. On May 6, 2009, Khouli instructed Lewis to wire $71,000 to his bank account. This amount represented the total cost of the funerary boats, limestone figures and a third item Lewis purchased from Khouli.[7]

41. On May 7, 2009, Alshdaifat's business partner Ramadan, sent an image to Khouli and Alshdaifat by e-mail of a shipping label bearing tracking number EE024392006AE. The label

_____

[7] The government does not seek to seize the third purchased item in this application.

21

showed that "antiques" were being shipped from Ramadan in the UAE
to Windsor's gallery in New York. The label did not contain the
declarations that are necessary for items valued at more than
$2,000, including value, country of origin and a meaningful
description. Nor was any formal entry made for these
antiquities.

42.   U.S. Postal Service tracking information shows
that the shipment bearing tracking number EE024392006AE was
delivered and signed for by "M KHOULI" in New York on May 12,
2009.

43.   On May 13, 2009, Lewis e-mailed Khouli and asked
him to "send the boats to" the SUBJECT PREMISES.

44.   Based on my training, experience and knowledge of
this investigation, I believe that the boats and limestone
figures described in Lewis's Insurance Schedule are the same
antiquities that Alshdaifat and Ramadan shipped to Khouli in May
2009. As set forth above, formal entry must be filed for items
valued at over $2,000. By shipping the items from Dubai to New
York by post and omitting material declarations about value,
country of origin and description of the items, Alshdaifat,
Ramadan and Khouli violated 18 U.S.C. § 545. The Egyptian
funerary boats and limestone figures are therefore subject to
seizure as smuggled contraband and evidence of criminal activity.
Moreover, because Lewis asked Khouli to ship these items to the

22

SUBJECT PREMISES, and because Lewis continues to insure these purchases under a collections insurance policy which states that insured items are located at the SUBJECT PREMISES, there is probable cause to believe that Lewis received the Egyptian funerary boats and limestone figures and is holding them at the SUBJECT PREMISES as part of his insured collection.

### THE SUBJECT PREMISES

45. The SUBJECT PREMISES is a private residence with red-brick exterior walls, a dark shingled roof and multi-pane glass windows with white frames. It consists of a main house, a breezeway and a conservatory. According to insurance records, the SUBJECT PREMISES contains display cases and is "museum-like." Images of the outside of the SUBJECT PREMISES, the Egyptian antiquities collection therein, and a floor plan are attached as Rider A.

46. Insurance records for EA Investment's collection of Egyptian Antiquities indicate that with the exception of a few items on loan to two museums, the entire collection is housed at the SUBJECT PREMISES in custom-built cabinetry. In light of the lengthy and detailed schedule of insured items provided to Lewis's insurance company, as well as Lewis's requests to Khouli for (false) provenances, I believe that records documenting the purchase, importation, curation and provenance of Lewis's collection items will be found at the SUBJECT PREMISES.

23

KHOUL I 000003616

## LEWIS'S USE OF COMPUTERS

47. As discussed above, Lewis corresponded with Khouli extensively by e-mail. Based on my training, experience and knowledge of this investigation, I believe that Lewis uses a computer to correspond by e-mail with Khouli and other dealers about cultural property transactions. While search warrants are effective at gathering e-mails and other files that are stored on Internet service providers' servers, where e-mails and their attachments are no longer available on the servers of internet service providers, such records may have been downloaded or stored on computer hard drives and other storage media.

## SEARCH AND SEIZURE OF COMPUTERS FROM THE SUBJECT PREMISES

48. As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

49. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

24

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on the storage medium that is not currently being used by an active file -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media -- in particular, computers' internal hard drives -- contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of

25

KHOULI000003618

operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

50. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and

26

KHOUL I 000003619

processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

        b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

        c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

27

KHOUL I000003620

d.    The process of identifying the exact files,
blocks, registry entries, logs, or other forms of forensic
evidence on a storage medium that are necessary to draw an
accurate conclusion is a dynamic process. While it is possible to
specify in advance the records to be sought, computer evidence is
not always data that can be merely reviewed by a review team and
passed along to investigators. Whether data stored on a computer
is evidence may depend on other information stored on the
computer and the application of knowledge about how a computer
behaves. Therefore, contextual information necessary to
understand other evidence also falls within the scope of the
warrant.

e.    Further, in finding evidence of how a
computer was used, the purpose of its use, who used it, and when,
sometimes it is necessary to establish that a particular thing is
not present on a storage medium. For example, the presence or
absence of counter-forensic programs or anti-virus programs (and
associated data) may be relevant to establishing the user's
intent.

51.    In most cases, a thorough search of a premises for
information that might be stored on storage media often requires
agents to seize physical storage media and later review the media
consistent with the warrant. In lieu of removing storage media
from the premises, it is sometimes possible to make an image copy

28

KHOULI000003621

of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires

29

KHOUL I 000003622

tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper

tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

52. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit officers either to seize or to image-copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and then later examine the seized storage media or image copies consistent with the warrant. The examination may require searching authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

30

## REQUEST TO SEARCH THE SUBJECT PREMISES

53. Based on the above facts, there is probable cause
to believe that a search of the SUBJECT PREMISES will yield
evidence of violations of Title 18, United States Code, Sections
542, 545 and 1956, including: (1) items (including Egyptian
antiquities) which are evidence of the receipt, transfer, sale
and/or disposition of works of art or antiquities that were
illegally imported into the United States in violation of the
Customs laws, including, but not limited to (a) one Greco-Roman
period wood coffin, (b) pieces of a nesting Egyptian sarcophagus
set (boards, posts and wooden birds), (c) ancient Egyptian
funerary boats and (d) ancient Egyptian limestone figures
(pictures of these items appear in Rider C); (2) business records
reflecting the importation, purchase, curation and sale of
cultural property, such as telexes, debit notes, checks, memos,
general ledgers and subsidiary ledgers, invoices, photographs,
provenances, purchase orders, bills of lading, and carrier
records; (3) correspondence, including mail, faxes, and e-mail
with customs brokers, exporters, importers, dealers and
transporters of cultural property reflecting transactions
involving cultural property, merchandise descriptions and
photographs, and country of origin information, and any
enclosures or attachments thereto; (4) bank records, financial
records, letters of credit, and consumption entry forms;

31

(5) importation records, including all documents sent to the United States Customs and Border Protection, as well as supporting documentation, including but not limited to, packing slips, purchase orders, contracts, and importation log books; and (6) computers and computer records, facilities, and storage media together with the contents thereof to be searched for (a) instrumentalities of the offenses specified below, (b) fruits of the criminal activity, and (c) evidence of the offenses specified below; all of which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 542, 545 and 1956.

## SPECIFICITY OF SEARCH WARRANT RETURN AND NOTICE REGARDING INITIATION OF FORENSIC EXAMINATION

54. Consistent with the Court's current policy, the search warrant return will list the model(s) and serial number(s) of any and all computers seized at the SUBJECT PREMISES, and include a general description of any and all associated peripheral equipment that has been seized. Additionally, the search warrant return will include the total numbers of each type of digital media that has been seized (e.g., "ten (10) 3.5" diskettes; twenty (20) CDs; twenty (20) DVDs; three (3) USB drives; one (1) 256 MB flash memory card," etc.)

55. Moreover, the Government will file a written pleading in this case within one hundred twenty (120) days after the execution of the search warrant notifying the court that the

32

imaging process of digital evidence seized from the target location is complete, and the forensic analysis of computers and media has begun. Such notice will include confirmation that written notice has been provided to the defendant or his counsel informing the defendant that the forensic examination of evidence seized from him has actually begun. Such notice to the defendant and the Court is not intended to mean, and should not be construed to mean, that the forensic analysis is complete, or that a written report detailing the results of the examination to date will be filed with the Court or provided to the defendant or his counsel. This notice does not create, and is not meant to create, additional discovery rights for the defendant. Rather, the sole purpose of this notice is to notify the defendant that, beyond the simple seizure of his property, a forensic search of that property has actually begun.

WHEREFORE, your deponent respectfully requests that a search warrant be issued authorizing members of Department of Homeland Security Investigations and their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described matter, to search the SUBJECT PREMISES and to seize therein the items described above, all of which constitute evidence, fruits and instrumentalities of violations of Sections 542, 545 and 1956 of Title 18, United States Code, namely, entry

33

of goods by means of false statements, smuggling goods into the
United States and laundering money, as well as other offenses.

$\overline{\phantom{XXX}}$ $E$ $\overline{\phantom{XXX}}$

BRENTON EASTER
Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn to before me this
___ day of July 2011

/s/
M. Hannah Lauck
United States Magistrate Judge

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF VIRGINIA

34

KH0UL I 000003627

Rider A



KHOULI000003628





KHOULI000003629



KHOUL I000003630

## Rider B

(1)  items (including antique coins and other antiquities) which
     are evidence of the receipt, transfer, sale and/or
     disposition of works of art or antiquities that were
     illegally imported into the United States in violation of
     the Customs laws, including, but not limited to (a) one
     Greco-Roman period wood coffin, (b) pieces of a nesting
     Egyptian sarcophagus set (boards, posts and wooden birds),
     (c) ancient Egyptian funerary boats and (d) ancient Egyptian
     limestone figures (pictures of these items appear in Rider
     C);

(2)  business records reflecting the importation, purchase,
     curation and sale of cultural property, such as telexes,
     debit notes, checks, memos, general ledgers and subsidiary
     ledgers, invoices, photographs, provenances, purchase
     orders, bills of lading, and carrier records;

(3)  correspondence, including mail, faxes, and e-mail with
     customs brokers, sellers, purchasers, importers, dealers and
     transporters of cultural property reflecting transactions
     involving cultural property, merchandise descriptions and
     photographs, and country of origin information, and any
     enclosures or attachments thereto;

(4)  bank records, financial records, letters of credit, and
     consumption entry forms;

1

KHOUL1000003631

(5)   importation records, including all documents sent to the
      United States Customs and Border Protection, as well as
      supporting documentation, including but not limited to,
      packing slips, purchase orders, contracts, and importation
      log books; and

(6)   computers and computer records, facilities, and storage
      media together with the contents thereof to be searched for
      (a) instrumentalities of the offenses specified below,
      (b) fruits of the criminal activity, and (c) evidence of the
      offenses specified below;

all of which constitute evidence, fruits and instrumentalities of
violations of Title 18, United States Code, Sections 542, 545 and
1956.

1

KHOUL I000003632

## Rider C

### (a) One Greco-Roman Period Coffin

 

KHOULI000003633

(b) Pieces of a Nesting Egyptian Sarcophagus Set
(Boards, Posts and Wooden Birds)



(c) Ancient Egyptian Funerary Boats



KHOULI000003634

(d) Ancient Egyptian Limestone Figures



KHOULI000003635