# EXHIBIT 12

# HEINONLINE

Citation: 19 DePaul J. Art Tech. & Intell. Prop. L. 219

Content downloaded/printed from
HeinOnline (http://heinonline.org)
Tue Oct 18 17:26:44 2011

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

-- To obtain permission to use this article beyond the scope
   of your HeinOnline license, please use:

   https://www.copyright.com/ccc/basicSearch.do?
   &operation=go&searchType=0
   &lastSearch=simple&all=on&titleOrStdNo=1061-0553

# THE IMPORTANCE OF PROVENANCE DOCUMENTATION IN THE MARKET FOR ANCIENT ART AND ARTIFACTS: THE FUTURE OF THE MARKET MAY DEPEND ON DOCUMENTING THE PAST

By Jane A. Levine[1]

## I. INTRODUCTION

Over the past decade, the international market in ancient art and artifacts has been beleaguered with scandal and controversy. Theft of archaeological objects,[2] and the efforts to penalize this type of theft, have made headline news.[3] The widely publicized Italian criminal prosecution in 2004 of Giacomo Medici, the pending trial of former curator Marion True and New York dealer, Robert Hecht, and the looting in Iraq of institutions and archeological sites have all contributed to catapulting cultural property issues into the public eye with attention not seen since the 1970's. Likewise, a significant amount of worldwide press has focused on the claims lodged against important United States museums relating to archaeological objects in their collections.[4] The resolutions to a

---

1. Jane A. Levine is presently the Worldwide Compliance Counsel, SVP at Sotheby's. She also served as an Assistant United States Attorney in the Southern District of New York prior to joining Sotheby's in 2006. The views expressed in this paper are entirely those of the author's and do not necessarily reflect the views of her current or former employers.

2. For purposes of this paper an archaeological object is defined as an object that has, over time, been buried in the ground with an associated assemblage of other artifacts, architectural remains, and natural features.

3. *See, e.g.*, Jason Felch, *Getty to Return Three Ancient Pieces to Italy*, L.A. TIMES, Oct. 4, 2005, at B1; Jason Felch & Ralph Frammolino, *Getty Had Signs It Was Acquiring Possibly Looted Art, Documents Show*, L.A. TIMES, Sept. 25, 2005, at A1; Jason Felch & Ralph Frammolino, *Getty Kept Items to Itself in Probe*, L.A. TIMES, Sept. 2, 2005, at B1; Barry Meier & Martin Gottlieb, *LOOT: Along the Antiquities Trail; An Illicit Journey out of Egypt, Only a Few Questions Asked*, N.Y. TIMES, Feb. 23, 2004, at A1; Elisabetta Povoledo, *Antiquities Trial Continues in Rome*, N.Y. TIMES, Feb. 21, 2008, at E2.

4. *See, e.g.*, Steven Litt, *Museum Returns Artwork to Italy*, PLAIN DEALER

Case 1:11-cr-00340-ERK   Document 54-12   Filed 01/24/12   Page 4 of 17 PageID #: 351

significant number of these claims involved settlement agreements. For instance, in 2006, the Metropolitan Museum of Art ("MMA") and Italy reached an agreement providing for the return of twenty-one objects (depending on how they are counted) including the famed Euphonious Krater and future long term loans and exchanges.[5] In November 2006 and again in August 2007, the J. Paul Getty museum agreed to return scores of objects to Italy, and, in 2007, the Boston Museum of Fine Arts returned thirteen pieces to Italy.[6] The sale of archaeological material continues to be a source of risk for museums, dealers, auction houses and collectors.

Whether or not the media attention and claims have diminished the pillage and looting of archeological sites worldwide is fiercely debated. Some say formal claims pursuant to cultural property laws are simply the political muscle flexing of modern nations and governments pursuing national political purposes, and that the so called "retentionist cultural property laws" do nothing to stop the looting.[7] Others say claims for restitution occurring after irreparable damage has been done to the sites and the historical

---

(Cleveland), Nov. 23, 2008, at A1; Elisabetta Polovedo, *Boston Museum Returns 13 Ancient Works to Italy*, N.Y. TIMES, Sept. 29, 2006, at E27; Carol Vogel, *Ciao to a Met Prize Returning to Italy*, N.Y. TIMES, Jan. 11, 2008, at E33.

5. Press Release, Metro. Museum of Art, Statement by the Metropolitan Museum of Art on Its Agreement with Italian Ministry of Culture (Feb. 21, 2006), *available at* http://www.metmuseum.org/Press_Room/full_release.asp?prid=%7BF9704AC3-297B-4704-999B-111ACC8E6804%7D.

6. *See* Press Release, J. Paul Getty Museum, Italian Ministry of Culture and the J. Paul Getty Museum Sign Agreement in Rome (Sept. 25, 2007), *available at* http://www.getty.edu/news/press/center/italy_getty_joint_statement_092507.html; Press Release, J. Paul Getty Museum, J. Paul Getty Museum to Return 26 Objects to Italy (Nov. 21, 2006), *available at* http://www.getty.edu/news/press/center/statement06_getty_italy_meeting111706.html ; Press Release, Museum of Fine Arts, Boston, Deputy Prime Minister of Italy Unveils Ancient Masterpiece on Loan to the Museum of Fine Arts, Boston (Nov. 28, 2006), *available at* http://www.mfa.org/about/sub.asp?key=82&subkey=3797.

7. See JAMES CUNO, WHO OWNS ANTIQUITY? (2008) for articulation of this viewpoint.

record is too little too late, and that the focus needs to be on the development of effective international legal policies aimed at the prevention of site destruction and regulation of the market in looted objects.[8] However, regardless of one's views on the efficacy of restitution claims to diminish and discourage looting, it is impossible to ignore the perceptible, if gradual, shift in the market toward more rigorous provenance standards.

A credible and documented provenance, or ownership history, stands as a kind of buffer zone at the intersection between an antiquities market that could function legally and legitimately, and the dirty and largely illegal business of site looting.[9] As the market demands and requires solid blue chip provenance for archaeological objects, freshly "looted" artifacts taken out of the ground recently and illegally become far less likely to circulate on the legitimate, legal market. Higher provenance standards reduce the chances that law-abiding and legitimate institutions, collectors and vendors contribute to the cycle of looting and destruction of archaeological sites – and the irreparable loss of historical context and information that goes hand in hand with looting. A higher standard of care in due diligence research provides the best mechanism to distinguish between objects that are legal to sell either because they have been excavated and exported legally or because they have been out of the ground and their countries of modern discovery for so long that they are not reasonably connected with recent criminal looting, and objects that are the products of recent and ongoing looting and destruction of sites.

## II. LEGAL BACKGROUND AND CONTEXT

The movement toward stronger provenance standards originates

---

8. *See generally, e.g.*, ROGER ATWOOD, STEALING HISTORY: TOMB RAIDERS, SMUGGLERS, AND THE LOOTING OF THE ANCIENT WORLD (2004); NEIL BRODIE ET AL., TRADE IN ILLICIT ANTIQUITIES: THE DESTRUCTION OF THE WORLD'S ARCHAEOLOGICAL HERITAGE (2001); Patty Gerstenblith, *Controlling the International Market in Antiquities: Reducing the Harm, Preserving the Past*, 8 CHI. J. INT'L L. 169 (2007).

9. This paper uses the word provenance to mean an object's ownership history, rather than the word provenience, which typically means an object's find spot or where it was originally discovered in context.

in part with the law enforcement context governing and regulating cultural property and heritage. Many nations (mostly those rich in archaeological sites within their borders) have enacted laws vesting ownership of undiscovered artifacts still buried in the ground in the nation.[10] The central distinguishing feature of such laws is that they establish legal national *ownership* over the objects. In contrast, export regulations (the laws requiring licenses to export and otherwise regulating what can and cannot be exported) do not necessarily establish legal title and ownership. Ownership laws applicable to archaeological objects buried in the ground can have sharp teeth, as these laws can give rise to both criminal and civil liability to persons who knowingly transfer, possess and deal in such property.

Courts in the United States have forcefully recognized and reaffirmed that to take, sell, and possess archeological materials removed from the ground without permission from a nation that has an ownership law vesting ownership of those underground materials in the government constitutes theft or stealing, in violation of the Federal law of the United States. In 1977 and 1979, the Fifth Circuit Court of Appeals, in two reported cases, affirmed the convictions of several dealers for conspiring to violate the National Stolen Property Act for dealing in Pre-Columbian artifacts owned by Mexico under Mexican ownership law.[11] More recently, the well-publicized conviction of New York dealer Frederick Schultz provided the Court of Appeals for the Second Circuit an opportunity to reaffirm the Fifth Circuit rulings and cement the law on this issue.[12]

The United States is not the only jurisdiction in the world to acknowledge the need for regulation in the antiquities trade and to adopt stringent laws in this area. The "first" international regulation is generally acknowledged to date back to the November 1970 United Nations Educational, Scientific, and

---

10. For example, Egypt, People's Republic of China, Iraq, Italy and Mexico all have some form of legislation declaring the state or nation to be the owner of artifacts that are underground and not yet excavated.

11. *See* United States v. McClain, 593 F.2d 658 (5th Cir. 1979); United States v. McClain, 545 F.2d 988 (5th Cir. 1977). The National Stolen Property Act is codified as amended at 18 U.S.C. §§ 2314-15 (2006).

12. *See* United States v. Schultz, 333 F.3d 393 (2d Cir. 2003).

Case 1:11-cr-00340-ERK Document 54-12 Filed 01/24/12 Page 7 of 17 PageID #: 354

Cultural Organization Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property ("1970 UNESCO Convention").[13] The 1970 UNESCO Convention received swiftest recognition from countries rich in archaeological resources. The United States enacted legislation implementing the 1970 UNESCO Convention in 1983 – the Cultural Property Implementation Act.[14]

Within the last five to ten years numerous so-called "market" countries have become State Parties and enacted implementing laws. The United Kingdom enacted implementing legislation for the 1970 UNESCO Convention in 2003, largely in response to the prevalent looting in Southern Iraq that erupted after the United States 2003 invasion. The Dealing in Cultural Objects (Offences) Act 2003 makes it a crime to deal in "tainted cultural objects."[15] The law includes under the rubric of "tainted cultural objects" items illegally excavated after 2003.[16] Switzerland's implementing legislation, also enacted in 2003, places an obligation to undertake due diligence on the "art trade and auctioning business" such that buyers may assume that the property is not stolen, not illegally excavated and not illicitly imported. Switzerland is in the process of negotiating bilateral

---

13. Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property, Nov. 14, 1970, 823 U.N.T.S. 11806.

14. Convention on Cultural Property Implementation Act, Pub. L. No. 97-446, 96 Stat. 2329 (codified at 19 U.S.C. §§ 2601-13 (2006)) (CPIA). The Senate Report to the CPIA recognized that the United States is a destination for looted archaeological materials, and that it is an obligation of good international citizenship for the United States to participate in efforts to curtail the trade in looted and stolen antiquities. *See* S. REP. NO. 97-564, at 23 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 4078, 4100. The CPIA implements two sections of the 1970 UNESCO Convention: it prohibits importation into the United States of stolen cultural property that had been documented in the inventory of a public or secular institution in another State Party and it grants the President authority to impose import restrictions on designated categories of archaeological and ethnological materials that are subject to pillage, or endangered, in another State party. The United States has agreements with twelve other State Parties concerning import restrictions on endangered types of property, the most recent agreement entered into with the People's Republic of China. *See* §§ 2601-13.

15. Dealing in Cultural Objects (Offences) Act, 2003, c. 27, §§ 1-6 (U.K.).

16. *See id.* at § 2(2)(a).

224        DEPAUL J. ART, TECH. & IP LAW        [Vol. XIX:2

agreements with Egypt, Turkey, Guatemala and Russia. Other so-called market nations that have become State Parties to the 1970 UNESCO Convention include: Japan in 2002, Sweden in 2003, South Africa in 2004, and Norway in 2007.[17]

III. ANALYSIS

### A. Market Trend: Demand for Documentation

Whether motivated by belief in the value of cultural heritage preservation or by self-preservation, buyers and sellers are demanding and getting better and deeper provenance for ancient materials. The lessons learned from the past decade have taught many market participants that sketchily documented archaeological objects sold today carry a risk of being the subject of claims and lawsuits tomorrow. Among the many lessons being heeded is that, while legal claims to archaeological objects may have long odds of success, they also have a long shelf life. It can be extremely difficult for a nation to come forward with credible evidence proving the illegal removal of an object from an undiscovered underground site, as most archaeological thefts occur at sites that have not been previously discovered and the objects underground obviously have never been seen or documented before making it extremely difficult to link a particular piece with a particular site or theft. Yet recent enforcement efforts of Italy, India, China, Egypt and others have demonstrated that when such evidence *is* discovered, objects introduced to the market decades earlier can pose serious, criminal, civil, and reputational risks for the present. This point is well illustrated by the MMA's 2006 settlement with Italy to repatriate the krater acquired *in 1972*.

By continuing to develop and implement more rigorous standards for provenance, market players stand to reap long-term gain and benefits. Full provenance commands better market value; clients will feel secure when acquiring if they can later sell or

---

17. The United Nations contains a complete and current list of State Parties and the dates of adoption. United Nations, UNTC, http://treaties.un.org/Pages/showDetails.aspx?objid=08000002801170ec (last visited Apr. 7, 2009).

2009]            *PROVENANCE DOCUMENTATION*            225

donate the objects without fear of future reprisals or monetary loss in the future.[18] There is an increasing recognition that the long-term sustainability of the market for archeological objects depends on how successful market players (buyers and sellers) can transform the business from one that has historically treated provenance as an irrelevant afterthought, to one in which provenance plays a central role in determining the legitimacy and value of the object. The long term survival of the antiquities market will be determined by many factors, one of the most critical factors being whether participants are able to reach a general industry-wide international consensus on the standards of due diligence required in determining "documented" ownership history.

If the media is an indication, the emphasis on the importance and benefits of reliable provenance documentation has started to expand from the pages of court opinions into the behavior of the marketplace. A recent New York Times article discussing the future of the antiquities market noted that at least one antiquities dealer interviewed, "envisions that the market for antiquities . . . will resemble that of old masters or Impressionist paintings, which have increased sharply in value of late."[19] The article quoted the dealer as saying, "[t]he more questionable works entering the antiquities market, the less their value and the larger the dark cloud that hangs over the field . . . [t]hat affects prices negatively. I think we could put an end to the new supply, and work comfortably with what we have."[20] Similarly, a New York Times article covering the Italian trial of Marion True, quoted Peter C.

---

18. After Sotheby's record breaking $28.6 million sale of the Artemis bronze in the June 2007 Antiquities Auction, the Bloomberg art writer reported that, "[d]ealers said that pristine ownership history made the Albright-Knox works even more desirable, especially at a time when the antiquities field has been mired in legal battles over artworks with murky histories." Lindsay Pollack, *Bronze Artemis Sells for $28.6 Million, Sets Records*, BLOOMBERG, June 7, 2007, http://www.bloomberg.com/apps/news?pid=20601088&sid=agaewu8u95EE&refer=muse.

19. Ron Stodghill, *Do You Know Where That Art Has Been?*, N.Y. TIMES, Mar. 18, 2007, at 31.

20. *Id.* (quoting Hicham Aboutaam, co-owner of the gallery Phoenix Ancient Art).

Marzio, director of the Museum of Fine Arts in Houston and past president of the AAMD, making the following comment on Sotheby's sale of the Artemis bronze: "Provenance is what is driving prices up. Provenance is having enormous value."[21]

### B. American Museums Tighten Standards

Museum standards on acquisition of archaeological objects reflect the same evolution toward increased ownership history documentation. The International Council of Museums (ICOM) adopted a Code of Ethics in 1986, recommending, among other things, that:

> every effort must be made before acquisition to ensure that any object or specimen offered for purchase, gift, loan, bequest, or exchange has not been illegally obtained in or exported from, its country of origin or any intermediate country in which it might have been owned legally (including the museum's own country). Due diligence in this regard should establish the full history of the item from discovery or production.[22]

In June 2004, the Association of American Museum Directors ("AAMD") issued a Report on the Acquisition of Archaeological Materials and Ancient Art, recommending that member museums adopt standards requiring archeological material to have been out of its country of modern discovery for a period of ten years prior to acquisition.[23] The AAMD's June 2004 policy recommendation was vulnerable to criticism on the ground that the ten-year rolling policy provided inadequate legal protection, as many nations have

---

21. Elisabetta Povoledo, *Antiquities Trial Fixes on Collectors' Role*, N.Y. TIMES, June 9, 2007, at B9.

22. International Council of Museums, Code of Ethics for Museums, http://icom.museum/ethics.html#section2 (last visited Apr. 9, 2009).

23. ASS'N OF ART MUSEUM DIRS., REPORT ON ACQUISITION OF ARCHAEOLOGICAL MATERIALS AND ANCIENT ART 5 (2004), *available at* http://www.aamd.org/papers/documents/TaskForceReportwithCoverPage_Final.pdf.

Case 1:11-cr-00340-ERK Document 54-12 Filed 01/24/12 Page 11 of 17 PageID #: 358

statutes of limitation or prescription periods longer than ten years. In addition, it is arguable that the concept of measuring provenance against a rolling time period standard operates as an invitation to the unscrupulous to warehouse questionable items for ten years and then bring them to the market when there is a "documented" history of ten years.

In October 2006, the J. Paul Getty Museum adopted a Policy Statement requiring documentation or substantial evidence that a work of ancient art or archeological material has been out of its country of origin since 1970, the date of the 1970 UNESCO Convention.[24] Two years after that, and four years after announcing the ten year rolling period, on June 3, 2008, the AAMD significantly altered its position on this subject and issued a new recommendation to its member museums regarding archeological materials and ancient art, recognizing November 17, 1970 (the date of the 1970 UNESCO Convention) as "providing the most pertinent threshold for the application of more rigorous standards to the acquisition of archaeological materials and ancient art as well as for the development of a unified set of expectations for museums, sellers and donors."[25] Likewise, in July 2008, the American Association of Museums ("AAM") issued new Standards Regarding Archaeological Material and Ancient Art, recommending "museums require documentation that the object was out of its probable country of modern discovery by November 17, 1970."[26]

Significantly, the new Guidelines and Standards call for rigorous research into the ownership history as a precondition to acquisition of archaeological objects by purchase, gift, bequest or exchange. Under the AAMD Guidelines, member museums must:

---

24. Press Release, J. Paul Getty Museum, J. Paul Getty Museum Announces Revised Acquisitions Policy (Oct. 26, 2006), *available at* http://www.getty.edu/news/press/center/revised_acquisition_policy_release_102606.html.

25. Ass'n of Art Museum Dirs., New Report on Acquisition of Archaeological Materials and Ancient Art 4 (2008), *available at* http://www.aamd.org/newsroom/documents/2008ReportAndRelease.pdf.

26. Am. Ass'n of Museums, Standards Regarding Archaeological Material and Ancient Art 1 (2008), *available at* http://www.aam-us.org/museumresources/ethics/upload/Standards%20Regarding%20Archaeological%20Material%20and%20Ancient%20Art.pdf.

"thoroughly research the ownership history of archaeological materials or works of ancient art . . . prior to their acquisition, including making a rigorous effort to obtain accurate written documentation with respect to their history, including import and export documents."[27] The AAM Standards contain a substantially similar provision: "Museums should rigorously research the provenance of an object prior to acquisition, make a concerted effort to obtain accurate written documentation with respect to the history of the object, including export and import documents, and require sellers, donors, and their representatives to provide all available information and documentation."[28]

Both the AAMD Guidelines and AAM Standards further call on member museums to require sellers and donors to provide complete information and documentation. AAMD museums are advised that they should not "acquire a work unless provenance research substantiates that the work was outside its country of probable modern discovery before 1970 or was legally exported from its probable country of modern discovery after 1970."[29] Museums are directed under the AAMD Guidelines to "promptly publish" acquisitions of archaeological objects, including images and provenances making this information available to all interested parties.[30]

Both codes also recognize that there will be situations where, despite good faith and rigorous research and due diligence, it will not be possible to document the ownership history of an archaeological object back to 1970. The AAMD has established an object registry on its website where member museums are to publish those objects without documented provenance going back to November 1970, but which they decide based on an "informed judgment" were probably outside of the probable country of modern discovery prior to 1970 and therefore can be acquired anyway.[31]

---

27. Ass'n of Art Museum Dirs., *supra* note 25.
28. Am. Ass'n of Museums, *supra* note 26.
29. Ass'n of Art Museum Dirs., *supra* note 25, at 5.
30. *Id.*
31. *See* Association of Art Museum Directors, Object Registry, http://aamdobjectregistry.org/ (last visited Apr. 9, 2009). As of the date of this paper, one object has appeared on this registry, and already debate has begun

*C. Question for the Future: What Constitutes "Documentation"?*

Putting the "exception" issue aside, adoption of new more stringent and specific standards nonetheless marks a new era for the market in archaeological objects. With this new phase come additional tough questions. One central question museums, along with other collectors, buyers and sellers, will face in the future is what constitutes satisfactory documentation and what type of evidence can be considered when making the "informed judgment" to acquire archaeological objects that may lack formal provenance documentation? While the market may have arrived at a point in time where there is growing consensus on the concept of requiring provenance to be documented to a certain date – 1970 in the case of the museum guidelines – the question looking ahead is whether the market will arrive at an accepted consensus surrounding the *type* of documentation and the nature of the evidence that buyers and sellers will accept as proof of ownership history.

There likely will be little controversy over what constitutes the preferred form of documentation. Reliable, credible written invoices showing the historical chronology of the transfers of the object, or published proof of exhibition in books or catalogues are the traditional and typically persuasive methods of documenting provenance of art, and, when available, they certainly work for antiquities as well. However, holding the standard of documentation at this level will not adequately reckon with the fact that historically, buyers and sellers in this market have not created a documentary trail of transfer. Until relatively recently, the antiquities market was largely unconcerned (for better or worse) with the issue of creating a paper trail, and while that practice has been changing over the past decade, there is still substantial uncertainty surrounding how to deal appropriately with this past reality, and how to evaluate and assess the ownership history of objects knowing that provenance documentation may not exist even where the object has a perfectly acceptable provenance.

---

over whether the registry will be a "loophole" around the policy or whether it will be a sparsely invoked option as institutions begin to document provenance back to 1970. Only time will tell.

The challenge is to set the bar at an appropriately calibrated level; on the one hand the standard should not preclude the legitimate trade and movement of objects that in all likelihood have been out of the ground and out their countries of modern discovery for a sufficiently long time so as not to implicate (or encourage) recent looting or theft, and on the other hand, if the newly promulgated museum policies and guidelines are to be meaningful, the standards of documentation must be elevated from past practice, and there must be general acceptance in the field that it is time to jettison the legacy of accepting vague and unsubstantiated provenance, such as "old Swiss collection" or "from a reputable dealer" without delving further.

Staking out the new standards of documentation will not necessarily be easy.  There are some serious obstacles to documenting ownership history and they are not easily overcome. First, there is a deep and lingering hostility in the antiquities market to the notion of transparency regarding provenance. This attitude was eloquently documented in Simon Mackenzie's book, *Going Going Gone*,[32] and while the interviews transcribed in Mackenzie's book may now be several years old, they still represent the views of a strong segment of the market.

Another dilemma is that, even among market participants who are not averse to transparency and who undertake provenance due diligence in good faith, many legitimate transfers of archaeological objects have taken place without accompanying documentation, and in other cases, the documentation that may have been created contemporaneously with the transfer is long gone, given that it has been decades since anyone expressed a need or desire to see it.

Furthermore, many dealers and sellers who invoke confidentiality in response to requests for provenance information are not necessarily doing so in order to obstruct the due diligence process.  In many cases dealers and sellers are in fact bound by real fiduciary duties of loyalty to their clients and are obligated legally and ethically to maintain confidentiality unless they obtain consent from their sources. Sometimes old clients are just difficult to track down, and, when they *are* found often there can be

---

32. *See generally* SIMON R. M. MACKENZIE, GOING, GOING, GONE: REGULATING THE MARKET IN ILLICIT ANTIQUITIES (2005).

numerous reasons having nothing to do with illicit looting that cause them to refuse to provide documentation.

There is also the commercial reality permeating the antiquities market, as in many others, that in many transactions there is strong competitive disincentive for dealers and auctioneers to reveal a client/source to another dealer or auctioneer, as this serves to facilitate a competitor's business.

Will the roadblocks swallow up the entire story, and will the enactment of more rigorous provenance standards be the death knell for the legal and legitimate antiquities market? Or will the discretion provided under the new guidelines to exercise "informed judgment" turn into an exception that will threaten to eviscerate the bold provisions calling for documentation of provenance until at least 1970?

When grappling with the tough questions that will inevitably arise relating to how provenance can be "documented" in an environment that traditionally has shunned such documentation, it may be helpful and instructive to consider the following points that are familiar to trial lawyers but may not be self evident to curators, dealers or collectors: probative evidence takes different forms.

Traditional provenance research, much like traditional investigative inquiries involves a search for, among other things, reliable documents, such as a contemporaneously created invoices and publication and exhibition histories catalogue, which as noted above are no doubt are persuasive pieces of proof. It is of course critical to undertake a good faith effort to locate such documentation, but when the perfect documentary proof is not available it is important to ask what other pieces of evidence might exist. Are there other contemporaneously created documents that might refer to the object, such as insurance records, letters, or family photographs that might provide some good faith proof of where the object has been since 1970? Within the bounds of good faith due diligence, can we collectively identify other kinds of documentation that might corroborate how long an object has been out of its country of discovery, and can we arrive at an industry wide acceptance that such material must be made transparent and available in the course of acquisitions and transactions?

Another situation provenance researchers (like many other investigators) frequently confront when researching the ownership

history of archaeological objects is the client, donor or seller who can provide no more than a verbal account of the object's history. Blind acceptance of verbal accounts without testing them for independent indicia of reliability would seem to fall below the standard of care called for under the new policies and likewise below a standard of care designed to weed out the legitimate objects from those that are likely the product of recent illegitimate looting. A genuine and good faith effort to document provenance would call for a critical assessment of the source of the verbal account. Is the source an interested party with a motive to create provenance? Can additional, independent and uninterested sources be identified to corroborate the verbal account? Verbal accounts from multiple unconnected sources with no motive to lie or bend the truth, all reporting credibly and consistently about observing an object could well provide persuasive corroborative evidence of the item's historical location. And such accounts, verbal as they may be, would generally and reasonably be considered more persuasive than one lone verbal account from a single person standing to profit financially attesting that an object was in a private collection for the past 50 years. It is also worthwhile to keep in mind that the credible and circumstantially corroborated testimony of one witness would stand as sufficient evidence to prove many criminal charges, depending on the credibility of the source and other indicia of reliability. Thus in gathering "documentation" verbal information can be useful, but only if it is subjected to the equally rigorous process of evaluating the credibility of the sources and corroborating that information to the extent feasible.

## V. CONCLUSION

No doubt it will take time for the antiquities market to adjust to November 1970 as the "gold" standard, and all participants may not uniformly adopt that date. But wherever the temporal benchmark is set, it is equally important that generally accepted standards be developed concerning the quality of documentation and substantial evidence that will be accepted in making the informed judgments that go into establishing provenance, as acceptance of documentation or evidence that is lacking in basic indicia of reliability and credibility threatens to undermine what

the guidelines are trying to accomplish in the first place. More rigorous provenance research and greater transparency for the findings of that research would seem to be critical to effecting change and reducing looting of archaeological sites, as well as to mitigating the legal and reputation risk that has hung over the antiquities world for buyers and sellers, museums and donors.