# EXHIBIT 13

# IFAR Journal

INTERNATIONAL FOUNDATION FOR ART RESEARCH

CARDOZO SCHOOL OF LAW
JUL -6 2010
LIBRARY

- A Letter From the Executive Director of IFAR … 2
- Provenance: What Is It? … 4

**Edited Proceedings: PROVENANCE AND DUE DILIGENCE: A Workshop/Conference**
An IFAR/NYU Collaboration
April 29, 2000

### MORNING SESSION: Provenance Research

Introductions
  Lisa Koenigsberg, Sharon Flescher … 8

A Dialogue on Provenance and Due Diligence
  Constance Lowenthal and Stephen E. Weil … 10

Looted Art Research at the National Archives
  Greg Bradsher … 16

Provenance Research—Looking For Looted Art
  Sarah Jackson … 19

Provenance Research Tools
  Inge Reist … 23

Lost and Sometimes Found:
Findspots and Pedigrees of Ancient Art
  Robert Cohon … 32

Provenance: A Dealer's View
  Peter Marks … 37

### AFTERNOON SESSION: Due Diligence—Legal Issues

A First-Hand Account of the MFA&A
  Craig Hugh Smyth … 40

Due Diligence?
  John Henry Merryman … 41

Forfeiture of Artworks
  Alexander H. Shapiro … 46

Due Diligence for Acquiring Cultural Property in the New Millennium
  Linda F. Pinkerton … 50

LEGAL PANEL: PROVENANCE AND LEGAL RESPONSIBILITY: WHAT CONSTITUTES DUE DILIGENCE? … 53

Introduction: The Tale of the Two Chagalls or How N.Y. State Got its Statute of Limitations Rule
  Herbert Hirsch … 53

Panel Discussion: Herbert Hirsch, Moderator
John Henry Merryman, Linda Pinkerton, Alexander H. Shapiro, Stephen E. Weil … 57

Audience Questions … 64

- Stolen Art Alert … 73

Cover Photo: Checklists of Gallery Exhibitions held by Paul Rosenberg, Paris Photo, Frick Art Reference Library.

# Due Diligence for Acquiring Cultural Property in the New Millennium[1]

LINDA F. PINKERTON[*]

Currently, in all art transactions whether they are sales or donations, there is too much litigation and uncertainty about the quality of title. A buyer or transferee of title has little if any idea what he should do to satisfy the requirement of being diligent.

The requirement of due diligence arises in various legal contexts. (This has nothing to do with morality and the ethical guidelines of various professional organizations, which should and often do require more and better of their members.)

- It might be a simple replevin case about whether the possessor has good title.[2]
- It might involve a crime, such as theft or smuggling.
- It might involve entrustment under the Uniform Commercial Code (2-403).[3]
- It might involve the Statute of Limitations and whether a victim was diligent in looking for lost or stolen property.
- It might involve negligence.
- It might involve foreign law, or a treaty.
- It might be a breach of warranty case.

There are many fact patterns:

- Who is the transferee?
  - an innocent bona fide purchaser?
  - a merchant?
  - a sophisticated transferee such as a museum?
  - a bad faith purchaser?
  - a donee?
  - an heir?
  - or someone else?
- Who is the seller?
  - a garage sale?
  - a museum?
  - a sophisticated art dealer?
  - a government selling excess furniture?



Linda F. Pinkerton

- What is the object and what is its value?
  - is it art?
  - is it war loot of any kind?
  - is it an antiquity?
  - is it "foreign property"?
  - is it some country's "cultural patrimony" and, if so, which one?

Currently, the law will analyze the transferee's diligence depending upon all of these variables, law and fact, and there is practically no way for the transferee to know in advance what analysis to expect.

Is this uncertainty fair? Not fair enough. The marketplace deserves better. So do all good faith transferees. Due diligence standards, as they currently exist, are entirely ad hoc.

At least, in a lawsuit, the facts can be examined and weighed and the defendant has the opportunity to defend himself using those facts. And for every absolute rule imaginable, there is an obvious

---

*Linda Pinkerton is an attorney in private practice and former General Counsel, Christie's, Inc.

[1] This article is the edited transcription of remarks made by Linda F. Pinkerton at the IFAR/NYU Conference on April 29, 2000. Copyright Linda Pinkerton 2000.

[2] See, e.g., Autocephalous Greek Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc. (717 F. Supp.1374 (S.D.Ind. 1989) aff'd 917 F.2d 278 (7th Cir. 1990) or Guggenheim v. Lubell (77 N.Y. 311, 569 N.E.2d 426 (N.Y. 1991)) or The Republic of Croatia v. The Trustee of the Marquess of Northampton 1987 Settlement (203 A.D.2d 167, 610 N.Y.S.2d 363 (N.Y. 1994).

[3] See, e.g., Morgold, Inc. v. Keeler, 891 F. Supp. 1436I (N.D. Cal. 1995).

> "Is this uncertainty fair? Not fair enough. The marketplace deserves better. So do all good faith transferees. Due diligence standards, as they currently exist, are entirely ad hoc."

need for exceptions. For example—if the rule is that all transferees are free to buy or accept whatever they want without any obligation of diligence whatsoever, obvious exceptions must be made for grossly imbalanced equities such as a sophisticated commercial transferee shopping at a yard sale. If the rule is that all buyers of objects for a price over $X should make certain inquiries, obvious exceptions must be made for gifts or bargain sales. If the rule is that the whole burden is on the transferee, a novice transferee will be ill-used by a dishonest sophisticated seller.

In today's marketplace, the sophisticated transferee knows that he may be buying a lawsuit but has little idea of the standards against which the sale will later be judged. The unsophisticated transferee has very little, if any, idea of the issues, much less the possibility of a subsequent lawsuit.

Because we lack both a registration system for most private personal property, or title insurance, except for vehicles, the current system is unfair to unsophisticated transferees who acquire inexpensive objects in seemingly reasonable circumstances, which turn out, after the fact, to have been corrupt (for example, a tourist in a gift shop).

Is this "system" practical? Definitely not.
- There are too many variables.
- It is too difficult for most people to understand.
- It is too burdensome for casual or small transactions.
- Constant change makes the marketplace a crap shoot.
- There are no guidelines for transferees and no signs of any being universally adopted.

Title litigation is for the opportunist and his lawyer, particularly in the United States. There will always be a market for cultural prop-

> "There will always be a market for cultural property, and there is a need for the smooth flow of goods through that market. . . . There should be a reasonable standard of conduct in order to insure an orderly market..."

erty, and there is a need for the smooth flow of goods through that market.

What *should* the situation be? There should be a reasonable standard of conduct in order to insure an orderly market in personal property which is, or turns out to be, culturally valuable. Objects cannot be regulated, but human conduct can be.

I. Here are my suggestions for the steps to be taken prior to or at the time of acquisition for all transferees of cultural property. The term "cultural property" should be given the broadest possible definition but only at the time of the transaction:

- Every transferee should obtain and keep documents evidencing that the following inquiries were made. This is a matter of simple evidence. No documents equals no proof.
- Every transferee should obtain and keep a bill of sale, a deed of gift, or the instrument by which he acquired the object.
- Every bill of sale should name and show:
  - the address of the emporium, business or person from which the object was purchased, regardless of the name of the true owner
  - the price paid by the transferee
  - the date of the transaction
  
  Alternatively, the transferee's canceled check can serve as the record provided it has all of this information in full.
- Every transferee should ask the name of the true owner or person(s) conveying title and ask that the information be given to him no later than the date on which the title passes to the transferee.
- Every transferee should ask additional questions in reasonable places if the answers to any of the previous questions are unsatisfactory, or if any other circumstances related to the transaction, but not to any subsequent circumstances, would cause a reasonable transferee in those circumstances, but not in any subsequent circumstances, to question the quality of title.
- Regardless of any other steps taken, a transferee who knows, genuinely thinks, or, in the process of researching the object, becomes aware that the object is stolen or has a seriously flawed title which cannot be repaired as part of the transaction, but takes the object anyway, should be deprived of all the legal benefits of diligence and of good faith under the law.

II. Are there additional actions that should be taken by "sophisticated" transferees prior to or during the acquisition of cultural property in order to satisfy the requirement of due diligence concerning title? I say "yes," but, first, let's define "sophisticated transferee" as:

- any museum or entity owning and operating a museum anywhere, regardless of size
- any commercial seller of cultural property anywhere, regardless of size

*CONFERENCE PROCEEDINGS: PROVENANCE AND DUE DILIGENCE*

- any auctioneer of cultural property anywhere, regardless of size, receiving consignment of property for auction sale or accepting transfer of ownership of property
- any person who has ever held, or currently holds, himself out as an "expert" in or "collector" of art or cultural property
- every government entity

In addition to the steps already outlined for all transferees of cultural property, sophisticated transferees should obtain and retain documentary evidence that each of the following steps was taken. They should:

- contact, or require the transferor to contact, the Art Loss Register and determine whether the object has been reported stolen, and should keep on record the results of that inquiry.
- conduct searches on the Internet using obvious terms and obvious search engines and save the search results to determine whether anyone has reported the object as stolen. No party should have to search every Web site, but should conduct a reasonable number of searches using reasonable terms in light of what's available at the time. Six good ones are:
  - The Art Loss Register   http://www.artloss.com
  - Museum Security Network   http://www.museum-security.org
  - Jonathan Sazanoff of SAZ Productions   http://www.saztv.com
  - The FBI   http://www/fbi.gov/majcases/arttheft/art.htm
  - Interpol   http://www.stolenart.net/
  - Commission for Art Recovery, World Jewish Congress   http://www.wjc-artrecovery.org
- conduct, document and save at least some art historical research about the provenance of the object prior to consummating the transaction, taking into consideration how much time is available.
- learn the nature and reputation of the transferor and should make inquiries about them if the transferor is unknown to the transferee.
- condition the closing of the transfer on receiving the name and address of the true transferring owner and collect a warranty that the information is accurate and an indemnity from the transferor if the warranty is breached. Retain this information.

> "No party should be exempt from these rules merely because of the absence of red lights or warning signals."

- advertise the object in some public way, whether by exhibition, publication, or offering for sale, or all of these, within two years of the date of acquiring the object.

> "All transactions should be deemed irreversible regardless of wrongdoing on their 100th anniversary."

No party should be exempt from these rules merely because of the absence of red lights or warning signals.

III. Things that I do not think need to be done, or considered, to meet minimum standards:

- The price paid for the object should be irrelevant.
- An heir should have none of these burdens.
- A borrower or bailee should have none of these burdens.
- A donee should have none of these burdens unless the donee is a "sophisticated transferee," in which case the donee should have all of them.
- The age and particular cultural history of the object should not occasion more or less work merely because it might be, for example, Nazi loot. So might it be Bosnian loot or the result of any other terrible episode in history.
- No buyer or other prospective transferee should have to advertise anywhere that he is about to acquire an object.
- The conduct of parties (whether sophisticated or not) electing to exceed the minimum standards should not penalize those who do only this much.

IV. Repose:

All transactions should be deemed irreversible regardless of wrongdoing on their 100th anniversary.

■ ■ ■