UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UNITED STATES OF AMERICA

     - against –                  Cr. No. 11-340 (ERK) (SMG)

MOUSA KHOULI,
SALEM ALSHDAIFAT,
JOSEPH A. LEWIS, II and
AYMAN RAMADAN,

        Defendants.

------------------------------------------------------------------X


# MEMORANDUM IN SUPPORT OF
# OMNIBUS MOTIONS


                                   Peter A. Chavkin, Esq.
                                   Bridget M. Rohde, Esq.
                                   Mintz, Levin, Cohn, Ferris,
                                   Glovsky and Popeo, P.C.
                                   666 Third Avenue
                                   New York, NY  10017

                                   For the Defendant
                                   Joseph A. Lewis, II

<u>Of Counsel</u>
Toby Vick, Esq.
Scott A. Rader, Esq.

# TABLE OF CONTENTS

Page

INTRODUCTION...................................................................................................1

I.  SUPPRESSION MOTIONS................................................................................1

A.  The Search Warrant Affidavits For Mr. Lewis's Home and His Email
Account Were Fundamentally Misleading, Requiring Suppression Of
Everything Seized...........................................................................................2

1.  The Search Warrant for Joe Lewis's Home Was Obtained Through
Misleading Assertions and Material Omissions. ......................................3

2.  The Search Warrant for Mr. Lewis's Email Account Was Obtained
through Misleading Assertions and Significant Omissions.................12

B.  The Warrant for Mr. Lewis's Email Account was a General Warrant. ........14

C.  The Agents Far Exceeded the Scope of the Warrant for Mr. Lewis's Home,
Providing Another Reason Why Items Seized There Must Be Suppressed. ..16

II.  THE GOVERNMENT'S OVERALL MISCONDUCT WAS EXCESSIVE,
REQUIRING DISMISSAL .................................................................................22

A.  The Government's Press Releases and Media Comments Were Rife With
Errors That Were Unmistakably Designed To Harm Mr. Lewis. ..................24

B.  Mr. Lewis has been selectively prosecuted. ........................................................28

III.  THE MONEY LAUNDERING COUNT MUST BE DISMISSED AS A MATTER
OF LAW ...............................................................................................................30

IV.  COUNT 7 MUST BE DISMISSED BECAUSE VENUE DOES NOT LIE IN THIS
DISTRICT .............................................................................................................33

V.  THE COURT SHOULD CONDUCT AN IN CAMERA INSPECTION OF THE
GRAND JURY MINUTES...................................................................................34

CONCLUSION ...................................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988) ..................................................... 34

*Franks v. Delaware*, 438 U.S. 154 (1978) .........................................................................2, 22

*Gotti v. United States*, 2009 U.S. Dist. LEXIS 6018 (E.D.N.Y. Jan. 28, 2009) .................31, 32

*Groh v. Ramirez*, 540 U.S. 551 (2004) ...............................................................................15

*Gupta v. SEC*, 796 F. Supp. 2d 503 (S.D.N.Y. July 11, 2011) ..........................................28

*Marron v. United States*, 275 U.S. 192 (1927) ...................................................................20

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) .....................................................28

*United States v. Aguilar*, 2011 WL 6097144 (C.D. Cal. Dec. 1, 2011) ........................22, 23, 30

*United States v. Aguilera-Meza*, 329 Fed. Appx. 825 (10th Cir. 2009) ......................................32

*United States v. Castellanos*, 820 F. Supp. 80 (S.D.N.Y. 1993) .................................................2

*United States v. Cioffi*, 668 F. Supp. 2d. 385 (E.D.N.Y. 2009) .............................................15, 16

*United States v. George*, 975 F. 2d 72 (2d Cir. 1992) ..........................................................15, 16

*United States v. Kunen*, 323 F. Supp. 2d 390 (E.D.N.Y. 2004) .................................................2

*United States v. Lawson*, 377 Fed. Appx. 712 (9th Cir. 2010) ............................................33

*United States v. Leon*, 468 U.S. 897 (1984) ...............................................................................21

*United States v. Liu*, 239 F. 3d 138 (2d Cir. 2000) ...............................................................20

*United States v. Mask of Ka-Nefer-Nefer*, No. 4:11-cv-504-HEA (E.D. Mo. Mar. 31, 2012) .. 12

*United States v. Medlin*, 842 F. 2d 1194 (10th Cir. 1988) ...................................................20, 21

*United States v. Reilly*, 76 F. 3d 1271 (2d Cir. 1996) .......................................................2, 21, 22

*United States v. Santos*, 553 U.S. 507 (2008) ........................................................................31, 32

*United States v. Schultz*, 333 F. 3d 393 (2d Cir. 2003) .........................................................25

*United States v. Shellef*, 732 F. Supp. 42 (E.D.N.Y. 2010) .................................................31, 32

*United States v. Skinner*, 946 F. 2d 176 (2d Cir. 1991) ........................................................32, 33

*United States v. Swartzendruber*, 2009 U.S. Dist. LEXIS 19407 (D.N.D. Feb. 25, 2009) .......32

*United States v. Trejo*, 610 F. 3d 308 (5th Cir. 2010) ................................................................32

## STATUTES

18 U.S.C. § 371 ................................................................................................................36

18 U.S.C. § 542 ................................................................................................................16

18 U.S.C. § 545 ................................................................................................16, 35, 36

18 U.S.C. §1956 ................................................................................................16, 32

18 U.S.C. § 3237 ................................................................................................33

## INTRODUCTION

The case against Joseph Lewis has been materially poisoned by evidence seized pursuant to seriously flawed search warrant applications and executions, and recklessly inaccurate and prejudicial statements to the press.   This repeated and material misconduct is a matter of record.  Not only must the emails seized from Mr. Lewis's email account and the objects and documents seized from his home be suppressed, but, as in other recent cases where the Department of Justice has so cavalierly overstepped the bounds of propriety, the indictment against him must be dismissed as well.  At the very least, the government's cavalier treatment of the facts necessitates a review of the grand jury minutes in this case.

Beyond these wholesale defects, the money laundering charge is defective as a matter of law and Count 7 lacks venue in this district.  Both must be dismissed for these independent reasons.

## I.

## SUPPRESSION MOTIONS

The evidence seized pursuant to the search warrants for Joe Lewis's email account and for his home should be suppressed for three independent reasons:  (i) the warrants were obtained through misleading search warrant affidavits; (ii) the search warrant for Mr. Lewis's email account was an unconstitutional general warrant; and (iii) the executing agents far exceeded the scope of the search warrant for Mr. Lewis's home.

The government's flagrant disregard of the law merits suppression of all of the evidence seized pursuant to these warrants.

A.   **The Search Warrant Affidavits For Mr. Lewis's Home and His Email Account Were Fundamentally Misleading, Requiring Suppression Of Everything Seized.**

When the affidavit in support of a search warrant contains an inaccurate statement that (i) was made "knowingly and intentionally, or with reckless disregard for the truth" and (ii) "is necessary to the finding of probable cause," evidence seized pursuant to that warrant is subject to suppression. *Franks v. Delaware*, 438 U.S. 154, 156 (1978); *see also United States v. Castellanos*, 820 F. Supp. 80, 89 (S.D.N.Y. 1993) (Sotomayor, J.); *United States v. Kunen*, 323 F. Supp. 2d 390, 401 (E.D.N.Y. 2004) (Hurley, J.); *United States v. Reilly*, 76 F. 3d 1271, 1280 (2d Cir. 1996). The "meaning of an intentional falsehood is self evident" (*Kunen*, 323 F. Supp. 2d at 395), while a reckless disregard for the truth may be inferred "when omitted information was clearly critical to assessing the legality of a search." *Reilly*, 76 F. 3d at 1280 (where police officers "presented only a bare-bones description" of certain facts to the magistrate judge "that was almost calculated to mislead," and those officers were "themselves ultimately responsible for the defects" in the search warrant affidavit, suppression was appropriate).[1]

Suppression is necessary where conduct is "egregious" and therefore "must be deterred if the Fourth Amendment is to have any meaning." *See Castellanos*, 820 F. Supp. at 89 (ordering suppression of the fruits of the unlawful search conducted pursuant to an improperly obtained warrant, not just the return of improperly seized items).

In the present case, based on the discovery provided by the government, it appears that the government submitted two search warrant applications directly affecting Mr. Lewis during the underlying investigation of this matter. In each supporting affidavit, the government

---

[1]     At a minimum, defendants are entitled to an evidentiary hearing pursuant to *Franks* where they have made "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 156.

repeatedly presented exaggerated, conclusory assertions and omitted contextually important material facts. Most blatantly, these affidavits misleadingly painted Mr. Lewis and the alleged conspirators as grave robbers trafficking in stolen property, when the government knew that that was not true and more important, that it lacked proof to support these allegations.

Indeed, the government does not even contend in the indictment that Mr. Lewis trafficked in stolen property. The indictment's charges against him are based *solely* on his allegedly deceiving Customs in the importation process by improper entry methods. The government has not charged Mr. Lewis with anything else, nor has it suggested that there is evidence that he did anything else, as all of Mr. Lewis's activities were those of a buyer who, fairly viewed, was a victim of alleged criminal activity by the seller.

The following discussion leaves no doubt that the government acted here in the very way that courts have previously condemned. Altogether, the government's efforts thoroughly corrupted the search warrant process.

### 1. The Search Warrant for Joe Lewis's Home Was Obtained Through Misleading Assertions and Material Omissions.

In July 2011, just after obtaining a sealed indictment of Mr. Lewis and the other defendants, the government applied in Virginia for a warrant to search Mr. Lewis's home. *See* Tab 5a (Special Agent Brenton Easter's Affidavit in Support of an Application for a Search Warrant for the Premises Known and Described as 8902 Sawdust Trail, Chesterfield, Virginia). That warrant application epitomizes how seriously the government violated Mr. Lewis's Fourth Amendment rights, as it contained misleading assertions and made significant omissions.

In the application, the government constructed a narrative designed to paint Mr. Lewis as *a smuggler of stolen cultural property through an illicit importation process.* However, the government did not disclose to the Magistrate Judge that it could not show that Mr. Lewis

(i) was assigned responsibility for the importation process, (ii) was connected to any of the alleged actions taken to import the items, or (iii) was even told about how the importation process would occur. Instead, the government chose to imply that Mr. Lewis was involved and responsible for that process based entirely on a chain of inferences: that Mr. Lewis allegedly doubted the provenance of the pieces he purchased and the government's wholly unsupported assertion that "persons who smuggle cultural property of questionable provenance into the United States typically avoid detection by Customs by means of false statements...." (Tab 5a ¶ 10.)

If the government had disclosed to the Magistrate Judge that it was relying upon this chain of inferences as the sole basis for its charge against Mr. Lewis, it is likely that the Magistrate Judge would have been deeply troubled by the application. In addition, the government compounded the danger that the Magistrate Judge would be misled by selectively quoting emails to imply that Mr. Lewis must have known that the provenance was false when the full and accurate account would have, at the very least, led the Magistrate Judge to doubt whether Mr. Lewis had such knowledge. Finally, the warrant application never disclosed the absence of proof that any piece was stolen, preferring instead to create an aura that such proof did exist.

These numerous misleading statements and omissions in the government's warrant application were meaningful for the following reasons.

*First,* at the outset of its application, the government inaccurately attributed to Mr. Lewis a powerful yet unsupported motive to violate the law, averring that Mr. Lewis and others wanted to smuggle these pieces because they were trafficking in cultural patrimony (essentially "stolen" property) that necessarily had to be smuggled. *See id.* ¶ 10. A reviewing Magistrate

Judge was led to conclude that Mr. Lewis and others needed to violate the Customs law because they deliberately trafficked in stolen property.

Yet, the government could not in good faith allege then, as it still cannot today, that these items were stolen - let alone that Mr. Lewis believed them to be so. Indeed, the government has not and does not rely upon the National Stolen Property Act for any charge in the indictment – an indictment that was returned before the application to search Mr. Lewis's home was made.[2]

*Second,* beyond attributing a powerful yet false motive to Mr. Lewis, the warrant application misleadingly described *the purported proof* of Mr. Lewis's participation in the only criminal activity with which he ultimately was charged: personal or conspiratorial participation in a deceitful importation process. As noted, the application did not inform the Magistrate Judge that Mr. Lewis literally had no responsibility for, did not participate in and was not told of the allegedly deceitful means used to import the pieces in question. Instead, the application asserted that Mr. Lewis was culpable for smuggling because he must have known that the provenance he received from the seller of the pieces (Morris Khouli) was false. *See* Tab 5a ¶ 34. According to the government's affidavit: (i) Mr. Lewis knew that the provenance was in conflict with other unconnected emails from the same seller, (ii) on the basis of that conflict alone, Mr. Lewis must have known that he had an invalid provenance, *and therefore* (iii) Mr. Lewis was culpable for the importation process.[3]

---

[2]    The indictment was returned May 4, 2011 according to the search warrant affidavit dated July 12, 2011. *See id.* ¶ 4.

[3]    As we discussed at length in our motion to dismiss, the government theorizes that Mr. Lewis was criminally involved in the process by which the antiquities were imported solely because he obtained a provenance stating that the pieces were part of Mr. Khouli's father's collection in Israel in the 1960s (and therefore outside Egypt before it enacted its patrimony law), but he was told around the same time that Mr. Khouli did not currently possess the pieces he was selling -- that there was an "other" seller from whom Mr. Khouli was obtaining the pieces. If this was true, according to the government, the pieces

We have challenged the viability of this inferential chain in our motion to dismiss (Dkt No. 53) because doubts about a piece's provenance cannot equate with criminal participation in the process by which a piece is imported.  On the present motion to suppress, we challenge the misleading descriptions of evidence tendered by the government to the Magistrate Judge to establish each link in that chain, which deprived the Magistrate Judge of the ability to fairly evaluate that chain.

We recognize that to obtain a search warrant, the government need not provide probable cause to believe that Mr. Lewis was guilty of a crime – only that he possessed evidence of a crime.  Despite this, however, the government determined that proof of Mr. Lewis's culpability was important to its probable cause showing, as it made his culpability a centerpiece of the application.

In this context, the specific assertions and omissions included:

- By omitting the fact that a false provenance was not needed for importation under the regulations or Customs entry forms (and indeed no provenance was ever used, much less the one allegedly sought by Mr. Lewis) – *all of which the government knew* – the government deprived the Magistrate Judge of facts necessary to evaluate whether Mr. Lewis's purported effort to seek a questionable provenance linked him to the importation process which, by the government's own application, was central to the probable cause determination.[4]

---

could not have been part of Mr. Khouli's father's collection. That would mean that Mr. Lewis obtained a false provenance and that act, according to the government, made him culpable for an importation process in which he was not involved and of which he had no knowledge.

[4]     At the hearing on the motion to dismiss, for example, the government described Mr. Khouli as "a cultural property launderer [who] … creates good provenance for a piece, so that when it comes through

- The warrant affidavit omitted the fact that Mr. Khouli *on his own* – not at the request of Mr. Lewis – initially offered the provenance in question, for similar pieces purchased by Mr. Lewis. The government chose instead to imply that Mr. Lewis asked Mr. Khouli to create a false provenance at Mr. Lewis's suggestion in the middle of their relationship. The government did so by omitting a February 2011 email demonstrating that the provenance representation was volunteered by Mr. Khouli at the very outset of his relationship with Mr. Lewis *months before the provenance assertion derided by the government*. *See* Tab 2 (2/11/09 4:37 p.m. email) (demonstrating that at the outset of Mr. Khouli's commercial relationship with Mr. Lewis, Mr. Khouli wrote "Let me know what you think about the two Egyptian pieces these are from my dads collection he passed away about three years ago and my brothers and I want to sell them and split the money. So I am handling the collection let me please before I offer to someone else." *Id.* (grammar in original)). This provenance, volunteered by Mr. Khouli in February, was the same provenance that Mr. Lewis asked Mr. Khouli *to confirm* a couple months later when he was making an additional, costly purchase of similar pieces.

---

Customs, if it is scrutinized, they will see this is an item that left Egypt at a time when there were no laws protecting it from leaving Egypt." By juxtaposing this statement to the government's assertion that Mr. Lewis sought a false provenance, attempting to implicate him in the deceitful Customs importation process with which he is charged, the government unmistakably sought to imply that the provenance sought by Mr. Lewis and provided by Mr. Khouli was intended to be used for "when [the piece] comes through Customs" – an argument that, as the government knew, was illogical as a provenance is not part of the importation process and was not used here.

- The government chose to selectively quote and misleadingly summarize Mr. Khouli's crucial representations whose purported conflict was supposed to tip off Mr. Lewis to the invalidity of the provenance – a representation confirming the provenance as Mr. Khouli's father's collection in the 1960s and emails indicating that a seller other than Mr. Khouli was selling the pieces today.  The provenance representation was contained in an email from Mr. Lewis to Mr. Khouli that stated that "I want double check that you do guarantee the following: 1 – Provenance from your late father's collection, Israel 1960s ...."  *See* Tab 3 (4/12/09 3:41 p.m. email), followed by Mr. Khouli confirming that this was so.  *See* Tab 3 (4/12/09 3:54 p.m. email.)  Earlier, Mr. Khouli had written to Mr. Lewis that he had received the items from another seller.  *See, e.g.*, Tab 3 (3/6/09 5:35 p.m. email).  As is readily apparent – and contrary to the government's statements to the Magistrate Judge – a conflict between the provenance statement and the fact that Mr. Khouli was purchasing the piece from other sellers is not inevitable because the two representations describe the location of the piece *at different times.*  Put simply, the piece could have existed in Mr. Khouli's father's collection in the 1960s but been in a different seller's hands when it was sold to Mr. Lewis in 2009. The Magistrate Judge had no way of knowing this because of the government's misleading statements and its failure to accurately depict the emails.

8

- By completely omitting the fact that the purportedly conflicting email representations (the provenance representation in Mr. Khouli's 2/11/09 and 4/12/09 emails versus the emails indicating that Mr. Khouli would be purchasing the items from other sellers) were *not* part of the same email threads and were days apart, the government invited the Magistrate Judge to conclude that any conflict between the representations would have been obvious to Mr. Lewis.  In fact, the provenance representations were in emails of February 11 and April 12; the other seller representations were in emails of April 4, 7 and 8.

- The government further deprived the Magistrate Judge of information that would have cast doubt on its assertion that Mr. Lewis had reason to doubt the provenance he received when it omitted the speed and certainty of Mr. Khouli's confirmation of that provenance.  By quoting only a select portion of the email of April 12, 2009 (the email in which Mr. Lewis asked Mr. Khouli to confirm the provenance that Mr. Khouli had volunteered months earlier), the government hid from the Magistrate Judge that Mr. Khouli provided confirmation *immediately and unhesitatingly* – so fast and with such certainty that the recipient would have had less reason to doubt the response's validity.  Mr. Lewis wrote:

  > I am ready to wire the funds in the morning but because its a lot of $$$$, just to make sure there are no misunderstandings; I want double check that you do guarantee the following: 1-Provenance from your late father's collection, Israel 1960s; you have therefore established, to the best of your knowledge, these items have not been illegally obtained from an excavation, architectural monument, public

institution or private property. 2-Clearance by US
Customs (if the items are seized or detained more
than 30 days upon arrival into the US you will issue
a full refund). 3-The two outer sarcos are < 10%
repainted (you actually said there was no repainting,
but < 10% is fine for me). 4-The inner sarco is <
30% repainted. 5-I will receive the items within 60
days. 6-You will give me an invoice for the amount
paid and the full statement of guarantee of
provenance as stated above. I do not think any of
these terms are out of the ordinary. Please just
confirm by answering this email. *See* Tab 3.

And Mr. Khouli responded – within minutes – "fair enough." *See* Tab 3

(4/12/09, 3:54 p.m. email).

- The government omitted a background email showing that Mr. Khouli's

  representation that he was purchasing the items from "other sellers" was

  more likely a ploy by Mr. Khouli to arbitrarily raise the price he sought,

  instead of a true description that (according to the government) undercut

  the provenance representation. By doing so, the government made it seem

  like the "other seller" representation was true, meaning that the

  provenance representation had to be false if they in fact were in conflict.

  In that omitted background email, on March 6, 2009, when Mr. Lewis

  advised Mr. Khouli that a linen Mr. Khouli offered to sell him was

  common and too expensive, Mr. Khouli then asserted that the linen was

  part of a coffin Mr. Lewis had just bought and that the seller of that coffin

  had not told Mr. Khouli about the linen until after the sale. *See* Tab 3

  (3/6/09 5:35 p.m. email). This explanation was just as likely a concoction

  by Mr. Khouli to justify why he had not offered the linen to Mr. Lewis

  when he sold him the coffin to which it pertained. Absent this omitted

email, the Magistrate Judge had no way of knowing that Mr. Khouli previously had introduced the "other seller" representation for such an obviously self serving purpose weeks before, and had the Magistrate Judge known that possibility, he could have just as easily concluded that the "other seller" representation (not the provenance representation) was false.

Finally, the affidavit to search Mr. Lewis's home contained an additional misleading assertion that was perhaps the most pernicious of all. In a section titled "Background on Smuggling Cultural Property," the government baldly asserted, based on the experience of the case agent, that "persons who smuggle cultural property of questionable provenance into the United States typically avoid detection by Customs by means of false statements regarding the contents, value and countries of origin of their shipments." Tab 5a ¶ 10. No other link between Mr. Lewis and the importation process (again, the importation process being the *sole* basis for any alleged criminal activity by him) was set forth in the government's affidavit, and this conclusory assertion: (i) was offered without any empirical support; and (ii) was offered despite the fact that hundreds of foreign antiquities (which by their nature had to be imported) lawfully exist throughout the United States despite their bearing explicitly uncertain provenances. *See* Memorandum in Support of Motion to Dismiss filed January 24, 2012 at 21-23 and exhibits referenced (Dkt No. 53)).

The inappropriateness of making such unqualified, unsupported and definitive assertions could not have been lost on the government. But it has become the practice of the government in the antiquities field to do so without regard for the truth, as was shown recently, when the government was badly rebuffed and excoriated in a recent effort to seize an antiquity

from the St. Louis Art Museum. There, its similarly unqualified assertions were rejected by a federal court, which sternly admonished that "The Government cannot simply rest on its laurels and believe that it can initiate a civil forfeiture proceeding on the basis of one bold assertion that because something went missing from one party in 1973 and turned up with another party in 1998, it was therefore stolen and/or imported or exported illegally." *See* Tab 9 (*United States. v. Mask of Ka-Nefer-Nefer*, No. 4:11-cv-504-HEA, Opinion, Memorandum and Order (E.D. Mo. March 31, 2012)).

*   *   *

In failing to disclose all of the above matters, misleadingly describing evidence and asserting inaccurate facts, the government distorted the truth. These actions by their very nature were either deliberate or at least reckless and reflected an overall effort to portray Mr. Lewis as a knowing and willing participant in importation fraud (not an innocent buyer, victimized by others). Put simply, an accurate depiction would have, at best, left the Magistrate Judge seriously questioning Mr. Lewis's role and culpability.

### 2.    The Search Warrant for Mr. Lewis's Email Account Was Obtained through Misleading Assertions and Significant Omissions.

The affidavit in support of the warrant to search Mr. Lewis's email account was infected in much the same way as was the affidavit for the subsequent search of Mr. Lewis's home, discussed above. The government first wrongly planted the inaccurate yet inflammatory notion that Mr. Lewis had a powerful motive to smuggle: that he allegedly knew that the pieces were stolen from Egypt. *See* Tab 1a ¶ 6 (Special Agent Brenton Easter's Affidavit in Support of an Application for a Search Warrant for Various Electronic Mail Addresses). The government intensified the misleading illusion of criminal activity by implying that Mr. Lewis knew he had been given a false provenance. *See id.* ¶ 50.

12

In a section of the warrant to search Mr. Lewis's email account that was substantially similar to paragraph 10 of the affidavit for the warrant to search Mr. Lewis's home discussed above, the government advised that importation of cultural property in contravention of a foreign country's cultural patrimony laws violates the National Stolen Property Act. *See id.* ¶ 6. As mentioned earlier, this assertion was improperly designed to convey a powerful but fictitious motive to violate the law (knowledge that a piece was stolen). In fact, the government did not even allege in the indictment that Mr. Lewis knew the pieces were stolen and has never suggested that it had sufficient evidence that he knew this.

In addition, the government again compounded its deceit by misleadingly implying that Mr. Lewis knew that he had a false provenance. The government did this through critical omissions and an unsupported, conclusory assertion: having failed to mention (1) the February 11, 2009 email in which it was Mr. Khouli who initially volunteered the provenance of his late father's collection (not Mr. Lewis who concocted a provenance that Mr. Khouli agreed to), (2) a March 4, 2009 email confirming that the coffin was in Israel in the 1960s (Tab 2, 3/4/09 1:23 p.m. email with attached invoice) and (3) the April 12, 2009 email exchange in which Mr. Lewis sought *to confirm* that same provenance and Mr. Khouli did so promptly and without hesitation, the government baldly asserted that an email chain regarding payment by Mr. Lewis "concerned Lewis's purchase through Khouli of an ancient Egyptian coffin and Khouli's agreement to provide a false provenance." Tab 1a ¶ 50.

Further creating the illusion of Mr. Lewis's culpability, the government asserted, again in conclusory fashion, that as the buyer of a cut coffin, Mr. Lewis would have known that the coffin had to be smuggled. In fact, as the government well knew (the government's affiant claimed to be experienced in the field of antiquities, with "approximately five years" of

experience investigating "cultural property crimes," *see id.* p. 1), hundreds of cut coffins have been traded and possessed within the United States without any taint of illegality. Photographs from major museums and auction houses leave no doubt of this fact. *See* Tab 4 (auction house catalogues describing over 60 cut coffins).

This erroneous assertion was made worse by the government's assertion that the coffin had been cut *recently*. As the government averred: "A fresh cut in an Egyptian antiquity is also circumstantial evidence that the item was removed from Egypt after the enactment of Egypt's patrimony law in 1983 and therefore constitutes stolen cultural property...." *Id.* ¶ 41. Even if the coffin was cut recently, the government knew that there was no proof that Mr. Lewis knew that any coffin was freshly cut. Moreover, the government failed to note that the *other two of the three coffins* associated with the nested coffin had *no* cuts, making the significance of any cut in one of the three nested coffins even less meaningful.

## B.   The Warrant for Mr. Lewis's Email Account was a General Warrant.

The government's effort to search Mr. Lewis's email account was defective in a second way: it was not sufficiently particularized. The search warrant for Mr. Lewis's America Online ("AOL") email account did not reference any statutes that Mr. Lewis allegedly violated. It provided that "[t]his warrant hereby incorporates AOL Attachment A to describe the search procedure, as well as which electronic mail and other records are to be copied by AOL employees and in turn searched by special agents of the United States Immigration Customs Enforcement" (*see* Tab 1b) (Search Warrant for Various Electronic Mail Addresses, dated March 29, 2010). But Attachment A provided that ICE could seek all email, AOL instant messenger messages, all subscriber information, all account history, all detailed billing records, a complete log file of all activity relating to the account, all records of subscriber account preferences and all web pages from Mr. Lewis's email account. *See id.*

In other words, the warrant purported to restrict itself by referencing an attachment that contained no limitations. Indeed, the warrant did not even incorporate the terms of the supporting affidavit.

This warrant was therefore impermissibly general. In this Circuit, that requires the results of the search to be suppressed:

> To date, the Second Circuit has not taken sides in the debate on the particularity required for computer searches. There is, however, one form of particularity whose absence the Second Circuit has unequivocally and unqualifiedly condemned: "[A]uthorization to search for 'evidence of *a* crime,' that is to say, any crime, is so broad as to constitute a general warrant." [*United States v. George*, 975 F. 2d 72, 76 (2d Cir. 1992).] "[A] *fortiori* a warrant not limited in scope to any crime at all is . . . unconstitutionally broad." [*Id.*] at 77. *George* represents not simply a majority view, but the unanimous view of courts across the nation.

*United States v. Cioffi*, 668 F. Supp. 2d. 385, 392 (E.D.N.Y. 2009).

In *Cioffi*, as here, the search warrant for the defendant's personal email account sought all emails without limiting them to the crimes charged in the indictment or to any crimes at all. *Id.* at 389. The search warrant here plainly "did not, on its face, limit the items to be seized from [Mr. Lewis's] personal email account to emails containing evidence of crimes charged in the indictment or, indeed, any crime at all." *See id.* at 396.[5] No good faith exception applies because, as in *Cioffi,* the search warrant was facially deficient: "[s]ince it is obvious that a general warrant authorizing the seizure of evidence without mentioning a particular crime or criminal activity to which the evidence must relate is void under the Fourth Amendment, no

---

[5]        Even if it had incorporated the supporting affidavit (which it did not), the warrant would not be saved. As the *Cioffi* Court observed, a warrant that is invalid on its face is not saved by limitations contained in the supporting affidavit: "The fact that the *application* adequately described 'the things to be seized' does not save the *warrant* from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Cioffi*, 668 F. Supp. 2d at 394 (quoting *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)).

reasonably well trained officer could believe otherwise." *Id.* at 397 (quoting *George,* 975 F. 2d at 77).[6]   Here, the executing agents could not in good faith believe that their search was circumscribed in any way.

### C.   The Agents Far Exceeded the Scope of the Warrant for Mr. Lewis's Home, Providing Another Reason Why Items Seized There Must Be Suppressed.

Compounding its misleading search warrant affidavits for Mr. Lewis's home and email account, and its overly broad warrant for Mr. Lewis's email account, the government then executed the warrant to search Mr. Lewis's home by disregarding its terms.   In that search, the government acted as if it could seize whatever it wanted, regardless of the limitations in the warrant.

The search warrant for Mr. Lewis's home was limited to antiquities and related material.   Specifically, the warrant provided for seizure of "[e]vidence, fruits and instrumentalities of violations of 18 U.S.C. §§ 542, 545 and 1956, as set forth in Rider B".   *See* Tab 5b (Search and Seizure Warrant for Mr. Lewis's Home dated July 12, 2011)). Rider B plainly sets forth antiquities and documents related to antiquities and their importation as the items to be seized.   Moreover, while the supporting affidavit is not part of the warrant, it confirms what is obvious from the warrant and Rider B: that *only* the search and seizure of antiquities and documents related to antiquities and importation was sought and authorized.   For example:

- The government offered probable cause for seizures of antiquities alone: the Greco Roman coffin (the piece underlying Count 3 of the indictment);

---

[6]       Mr. Lewis's computer was seized as part of the search of his home. While the search warrant for Mr. Lewis's home was not a general warrant, there is sufficient reason to believe that the government conducted its search of the computer without any limitation, given the unbridled breadth of its warrant for Mr. Lewis's email account. At the very least, the government should provide the protocol it employed to examine the computer seized from his home so that we may determine whether that search provides the basis for a separate motion.

the nesting set of coffins (Counts 4, 6 and 7); and the funerary boats and limestone figures (Count 5). *See* Tab 5a at ¶¶ 24, 36 and 44, respectively.

- The government very specifically justified its need to seize documents relating to antiquities alone, stating that "[i]n light of the lengthy and detailed schedule of insured items provided to Lewis's insurance company [with respect to his collection of Egyptian Antiquities], as well as Lewis's requests to Khouli for (false) provenances, I believe that records documenting the purchase, importation, curation and provenance of Lewis's collection items will be found at the SUBJECT PREMISES." *Id.* ¶ 46.

- The "Request to Search the Subject Premises" section of the affidavit made plain that the items to be seized were all related to the smuggled cultural property investigation. The Greco Roman coffin, boats and figurines, and pieces of the nesting coffin set were all specifically identified as pieces to be seized. *See id.* ¶ 53(1). The documents to be seized were identified as business records, correspondence, financial records and importation records involving cultural property. *See id.* ¶ 53(2)-(5). The computer records were similarly supposed to be connected with the offenses under investigation (although, as mentioned, the warrant contained no such limitations). *See id.* ¶ 53(6).

- The search warrant authorized seizure of the items listed on Rider B to the affidavit and Rider B was a list of antiquities and antiquity related items. *See* Tab 5b.

17

Despite these crystal clear statements and the limitations they imposed, the majority of the items seized by the government from Mr. Lewis's home were obviously *wholly unrelated to antiquities*.   A list of those unauthorized seizures is breathtaking:

- The agents seized an antiquity that the government *expressly swore* to the Magistrate Judge that it would not seize.   Despite averring that "[t]he government does not seek to seize the third purchased item [a child coffin] in this application" (*see* Tab 5a n.7), the item was deliberately seized.

- The agents seized another antiquity whose presence the government knew about before obtaining the warrant: a mummy board.   It was described in the Chartis insurance records that the government had obtained by subpoena before the search (*see* Tab 6 (Chartis Records)) and Mr. Lewis's purchase was described extensively in emails that the government had seized.   Yet this antiquity was not specified in the search warrant affidavit (*see* Tab 1a, pp. 8-9) and the government has recently offered to return it along with the child coffin described above.

- The agents took *thousands of* documents that had nothing to do with antiquities – roughly 5000 of the 9000 seized.   In fact, many related to Mr. Lewis's insect collection.   *See* Tab 10 (December 5, 2011 discovery letter enclosing disk containing documents Bates-stamped Khouli 0003644-0018291).[7]

---

[7]     All seized documents were described in the government's inventory as "miscellaneous." *See* Tab 5c (Inventory Log).

- Even though the warrant, attached at Tab 5b, authorized members of ICE and other authorized agents to conduct the search – a search which, as mentioned, only included antiquities and antiquity related material – U.S. Fish & Wildlife Service agents were inappropriately invited to participate, undoubtedly contributing to the massive number of unrelated and unauthorized seizures.[8]

- The executing agents took documents relating to art, fossils, knickknacks, jewelry, and insects; insect shipping mounts; sea shells;[9] receipts for glass bugs and frogs, bronze frogs, bug jewelry, non-antiquity art (e.g., Indonesian wood carvings, sculpted metal art etc.); and a plethora of personal documents, including documents related to the Lewis family reunion, college loans for Mr. Lewis's sons, maintenance of his septic tank, front gate maintenance, auto information, business expense reports, the files of his wife's consulting business, his home mortgage, equipment leases, personal credit reports, retirement accounts, home security system, life insurance, employee disputes at his company, property tax returns, property tax assessments, airline mileage programs, house accessories, monthly bills, investment strategies, wealth management, and income tax

---

[8]       The government requested "that a search warrant be issued authorizing members of the Department of Homeland Security Investigations and their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above described matter [alleged smuggling of cultural property] to search the SUBJECT PREMISES [Mr. Lewis's home] and to seize therein the items described above [cultural property, related documents and computers]…." *See id.* ¶ 55.

[9]       "Box of shells" is the only improperly seized item that is listed on the government's inventory with any degree of specificity (and a word, perhaps sea, is crossed out before the word shells) and, as mentioned, the government's inventory describes seized documents as "miscellaneous." *See* Tab 5c.

returns going back to 2002, and documents relating to the construction of his home.

In short, the government could not have more pervasively ignored the limitations of the warrant.  The government seized more unauthorized documents than authorized ones.  It seized pieces that it *expressly* swore it would not seize.  And it seized more objects that were art or insect-related than antiquities.

Wholesale suppression is necessary to enforce the Fourth Amendment's proscription that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  Suppression ensures that search warrant affidavits "particularly describe the things to be seized ... [and] makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196 (1927).  As the Second Circuit made clear in *United States v. Liu*, 239 F. 3d 138, 140-41 (2d Cir. 2000), where "Government agents flagrantly disregard the terms of a warrant ... wholesale suppression is required when (1) they effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith."

Although the Second Circuit in *Liu* did not conclude that wholesale suppression was warranted, it reached that result because the agents in question had acted in a "fairly systematic" and rational manner – "not 'indiscriminate[ly] rummaging'" or engaging in "an 'exploratory' search." *Liu,* 239 F. 3d at 141.  The inexplicably broad seizures in our case stand in stark contrast making wholesale suppression the proper remedy. *See United States v. Medlin*, 842 F. 2d 1194, 1195-96, 1199 (10th Cir. 1988) (where officers executed a warrant to seize illegal firearms and related records and seized an additional 667 items that they believed to be stolen

property, "none of which were identified in the warrant authorizing the search," the court concluded that the warrant "was executed with flagrant disregard for its terms and [required] suppress[ion of] all the evidence seized including the firearms which were particularly named in the warrant …. When law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant").

The government cannot seek to rescue its misguided actions by invoking the plain view doctrine. On its face, the seized non-antiquity material had no relationship to any potential crime. Moreover, the government knew that many of the items it seized – most notably the insect-related items and insect-related documents – would be at Mr. Lewis's home before they sought and executed the search warrant, for they even cited the insurance records for Mr. Lewis's home in the warrant affidavit (Tab 5a ¶¶ 12, 13) and those insurance records clearly reflected the existence and location of those non-antiquity items. *See* Tab 6.[10]

One last point: the seizures of these non-antiquity related items were not inadvertent. The sheer volume of unauthorized seizures, and the undisputed fact that the government seized a coffin that it swore it would not seize, leave no doubt that deliberate or reckless conduct pervaded the government's effort, precluding any good faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 913 (1984) ("officers reasonably relying on a warrant issued by a detached and neutral magistrate"). As the Second Circuit has emphasized, good faith "is not a magic lamp for police officers to rub whenever they find themselves in trouble" -- especially where the affiant knowingly or recklessly included misleading statements. *Reilly*, 76 F. 3d at 1280. To the contrary:

---

[10]   Although we do not rely on this for this motion, the Fish & Wildlife agent present during the search mentioned in the presence of Mr. Lewis and others that he could not be sure whether any of the insect related material presented a problem – it depended on where and how they were obtained.

> [T]he good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts. Good faith is not a blanket excuse for any police behavior. A warrant is not a general hunting license, nor is it a mantle of omnipotence, which cloaks its holders in the King's power to "do no wrong." *And perhaps most important, it is not an excuse if the police are not frank with the magistrate in proceedings to obtain the warrant—proceedings that are typically ex parte.*

*Reilly*, 76 F. 3d at 1273 (emphasis added).[11]

Suppression is necessary here if the Fourth Amendment is to have any meaning.

## II.

### THE GOVERNMENT'S OVERALL MISCONDUCT WAS EXCESSIVE, REQUIRING DISMISSAL

We recognize that dismissal of an indictment based on government misconduct is rare, but the unique facts of this case make that severe remedy the most appropriate result. Courts will elect dismissal "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Aguilar*, 2011 WL 6097144, at *27 (C.D. Cal. Dec. 1, 2011). Even where excessive government misconduct does not amount to a due process violation, a court will exercise its supervisory powers to dismiss an indictment where appropriate. *Aguilar*, 2011 WL 6097144, at *25.

Indeed, in recent months, courts across this country have dismissed indictments for comparable misconduct. The most recent decision in *Aguilar* is instructive. There, the court exercised its supervisory power to dismiss an indictment where the government:

---

[11]     At the very least, this misconduct requires an evidentiary hearing pursuant to *Franks* because we have made a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included" by the government in the warrant affidavit and the false statement was "necessary to the finding of probable cause." *Franks*, 438 U.S. at 156.

(i)     inserted erroneous statements in an FBI agent's affidavits, resulting in procurement of a search warrant on the basis of a "material falsehood" (*id*. at *6);

(ii)     failed to comply with applicable law by inserting language in a warrant authorizing case personnel, not merely computer personnel comprising a filter team, to review electronically stored information found on certain seized computers (*id*. at *7);

(iii)     executed a search warrant by searching two buildings "that were not mentioned in the initial affidavit or authorized by the initial warrant" (*id*. at *7); and

(iv)     committed various discovery and trial violations (*id*. at *9-12, 15-19).

Finding that these acts were "clearly wrong" and "demonstrate, at best, that the Government was reckless in disregarding and failing to comply with its duties," the court concluded that charges were filed against the defendants "as a result of a sloppy, incomplete and notably over-zealous investigation." *Id*. at *27-28. Dismissal of the indictment was "justified not only as a deterrent but to release [defendants] from further anguish and uncertainty." *Id*. at *28.

Clearly, *Aguilar* involved more instances of misconduct than currently exist in our case. But as that court made clear, the threshold beyond which misconduct threatens the integrity of the judicial process is not determined by counting the number of instances of misconduct. Because remedying misconduct is a function of the court's supervisory power, each situation must be evaluated with one benchmark in mind: whether the "wrongful acts ... in the aggregate, warranted the exercise of supervisory power." *Id*. at *21. And as the *Aguilar* Court stressed, that evaluation is greatly influenced by "the weakness of the Government's case" (*id*. at

23

\*22) – a fact that, as we have discussed, makes each violation in our case that much more meaningful.

In addition to the materially misleading deceptions in multiple search warrant affidavits and the behavior of the government during the execution of those searches discussed above, the government's public pronouncements and its selectively choosing to prosecute Mr. Lewis confirm that the government adhered to no real limits. From its search warrant misconduct, to its poisonous press statements, to its selectively choosing to prosecute him, the government has determined to use any means it can to wrongly make an example of Mr. Lewis to all the other collectors in this country.

### A. The Government's Press Releases and Media Comments Were Rife With Errors That Were Unmistakably Designed To Harm Mr. Lewis.

The government's conduct with the press exceeded the bounds of propriety and the local rules. This misconduct is not a technical violation but part of an overall campaign to harm Joe Lewis.

On the day of arrest, both the U.S. Attorney's Office and the investigating agency (ICE/HSI) issued press releases. *See* Tabs 7a, 7b. In addition, Special Agent-in-Charge Hayes and Special Agent Easter made extensive comments to the media (*see* Tab 7c) (*CNN article of July 15, 2011* ("CNN Article"); *New York Times article of July 14, 2011* ("New York Times Article"), and ICE/HSI invited the press to view the antiquities it seized (just as it tried to poison the courtroom atmosphere only recently at Mr. Khouli's plea, dragging in the various antiquities, inviting the Court to view them, and unnecessarily including Mr. Lewis's name in the official press release *of Mr. Khouli's plea*). These statements contained a number of inaccurate and highly damaging accusations.

24

*First,* the government went out of its way to make Mr. Lewis seem like a stolen or looted property collector when the charges against him solely involve an effort to import an item deceptively.  There are numerous examples:

- The U.S. Attorney's Office's initial press release wrongly stated that this case involved cultural patrimony, just as the search warrant affidavits had misleadingly done.   As the United States Attorney's office stated, "Antiquities dealers and collectors are on notice that the smuggling of cultural patrimony will not be tolerated." *See* Tab 7a (Eastern District press release from July 14, 2011). Notably, the United States Attorney's press release did not say that *antiquities* were smuggled; it stated, instead, that the smuggled items were "cultural patrimony" – unmistakably implying that the items in question still belonged to the host country when they were sold, even though there is no allegation, much less proof, that that was true. *See, e.g., United States v. Schultz*, 333 F. 3d 393, 398 (2d Cir. 2003) ("In order to preserve its cultural heritage, Egypt in 1983 enacted a 'patrimony' law which declares all antiquities discovered after the enactment of the statute to be the property of the Egyptian government…The law makes private ownership or possession of antiquities found after 1983 illegal…"); Merriam-Webster Dictionary (cultural patrimony is "an estate or endowment *belonging by ancient right* to a church"; "an estate inherited from one's father or ancestor"; synonyms: "bequest, birthright …") (emphasis added).

25

- The ICE/HSI Special Agent-in-Charge (with the imprimatur of the United States Attorney's office) stated in the very same press release that: "This is a ground breaking case for Homeland Security Investigations.  It is the first time an alleged cultural property network has been dismantled within the United States...*This is notable because the illicit sale* of cultural property is the third most profitable black market industry following narcotics and weapons trafficking."  *Id.* (emphasis added).

- ICE headlined its separate press release with the baseless and poisoning statement that "ICE makes arrests and seizes cultural artifacts *stolen from Egypt*" and added a subheading stating "Set of Sarcophagi more than 2,000 years old."  *See* Tab 7b (ICE press release from July 14, 2011).

- The lead paragraph of the ICE press release wrongly stated that the defendants were "charged... with a scheme to smuggle illicit cultural property into the United States."  The agency perpetuated the misleading impression that this was a case about stolen property, saying in a *CNN* article that:  "As an investigator here I've seen looting from all different regions, but specifically with this case, we actually have information, and we know for a fact, that they were using metal detectors to actually find and locate some of the pits they would dig and loot."  Tab 7c (CNN Article).

*Second,* the government made various misrepresentations about Mr. Lewis's history and the kind of antiquities at issue.  Specifically:

- Special Agents inaccurately asserted that Mr. Lewis was part of an international network ("This is one of the first times in the U.S. that we've actually dismantled an entire network.  What we've done is identify the person in the Middle East who was the conduit, we've identified the broker, we've identified the individual providing false provenance, and we've identified the end-all collector").  *Id.*  The government knew that Mr. Lewis had only participated in a handful of purchases over a three month period.

- The case agent also distorted the geographical scope of the crimes in the indictment, stating "In addition to items from Egypt, Easter said investigators also seized artifacts from Libya, Iraq, and Afghanistan." *Id.*

- And the agency told multiple media outlets that the antiquities at issue were worth $2.5 million when, in the forfeiture notice prepared *by this same agency*, the antiquities were valued at a fraction of that number. *See* Tab 7c. (New York Times Article) ("Brenton Easter, a federal agent who led the investigation, which began in 2008, said the items seized had a market value of $2.5 million"); (CNN Article) ("Among the antiquities valued at a total of more than $2.5 million that ICE agents confiscated were…").

Finally, the United States Attorney's Office continued to poison the atmosphere surrounding Mr. Lewis when it issued a press release only days ago in connection with *Mr. Khouli's* guilty plea.  Although Mr. Khouli's guilty plea did not mention or even allude to Mr. Lewis, the United States Attorney gratuitously recounted to the public that the antiquities in

question had been seized in a search of "Joseph A. Lewis II's residence in July 2011." *See* Tab 7d (Eastern District press release from April 18, 2012).   There was no conceivable reason to say this other than to further harm Mr. Lewis in the public eye.

**B.      Mr. Lewis has been selectively prosecuted.**

In addition to the poisonous press statements against Mr. Lewis – statements that lacked a basis in any charge in this case – the government selectively chose to make an example of Mr. Lewis.  As Judge Rakoff recently reminded the government, a selective prosecution motion may be appropriate if there is a "public record of [this defendant] being treated substantially disparately from" a number of "essentially identical" individuals and "there is no rational basis for the difference in treatment." *Gupta v. SEC*, 796 F. Supp. 2d 503, 513-14 (S.D.N.Y. July 11, 2011) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-64 (2000)).

Here, the public record of disparate treatment is clear: Mr. Lewis has been charged when collectors accused by the government of far worse conduct have escaped criminal charges.  For example, customers of *the very same seller* who, according to the government's sworn assertions, received no provenance or were knowingly provided false provenances, were *not* charged.  *See* Tab 1a ¶ 9.  Indeed, outside of this case, the number of traded antiquities with dubious, questionable or unknown provenances are too numerous to count *yet none of those sellers or buyers have been prosecuted* based on questionable provenance alone – the only factor here.  And earlier this month, the U.S. Attorney's Office for the Southern District of New York filed a civil forfeiture case (and no criminal charge) in connection with a Cambodian statue that had been consigned to Sotheby's for sale despite alleging that Sotheby's *knew the piece was stolen.*  *See* Tab 8 (*New York Times*, "Mythic Warrior is Captive in Global Art Conflict," February 28, 2012).

28

Making the arbitrariness of Mr. Lewis's indictment even more notable is the dearth of evidence upon which the government has proceeded. And it is continuing to proceed in this fashion despite the recent plea of Morris Khouli – a plea that further highlights the absence of any evidence of Mr. Lewis's guilt. Mr. Khouli, who was the alleged center of the smuggling network as the seller of the pieces and the man who arranged for their importation, recently pled guilty to a substantive count in the indictment (despite the presence of a conspiracy charge), allocuted to his involvement and no one else's, and did so without a 5K1.1 agreement.

The reality is that determining ownership of antiquities is a matter of serious, ongoing and heated debate among academics and museum professionals and, accordingly, law enforcement has not charged buyers criminally – even when the government claims that those buyers had suspicions about the validity of the provenance of their pieces – unless those buyers engaged in some identifiable additional criminal behavior. The sole exception is Mr. Lewis.

*     *     *

In short, the government engaged in excessive misconduct by submitting misleading search warrant affidavits to numerous Magistrate Judges over the course of the investigation in this case, far exceeding the scope of the search warrant for Mr. Lewis's home, indiscriminately seizing countless items and documents utterly unrelated to antiquities, and perpetuating its misconduct in repeated inflammatory statements to the press – statements that were not only materially wrong and in conflict with the government's own prior statements but also far outside the public record. In addition, it chose to prosecute Mr. Lewis, a mere collector, when it has not prosecuted those who allegedly had done far worse. And it has not notified us of what, we presume, is its knowledge of a crucial fact: that the centerpiece of the alleged

conspiracy did not engage in conversation or conduct with Mr. Lewis that reflected Mr. Lewis's culpability for deceiving Customs.

In a case where the evidence against Mr. Lewis is equivocal at best, this kind of misconduct should be met with the most serious remedy available to the Court. *See, e.g., Aguilar.* The indictment should be dismissed.[12]

### III.

### THE MONEY LAUNDERING COUNT
### MUST BE DISMISSED AS A MATTER OF LAW

As discussed, the government has gone far afield to persecute Mr. Lewis. The money laundering conspiracy count in this indictment is another example.

Mr. Lewis's involvement in money laundering is premised on his payment to Mr. Khouli to purchase an antiquity from him. It is not based on a payment to help import the item or to pay any importer – even though it is the importation process alone that underlies the government's entire case against Mr. Lewis.

We respectfully urge that Mr. Lewis's payment to buy a piece does not promote the specified unlawful activity charged in this case: an allegedly deceitful importation. A purchase payment must be made regardless of whether a piece is to be imported. This alone requires the dismissal of this count.

But even if the payment to buy the piece were legally sufficient to support the crime of illegal importation, the money laundering charge against Lewis still would have to be dismissed because the money laundering would then be based entirely on the same conduct that

---

[12]    We understand that co-defendant Salem Alshdaifat suffered from serious governmental misconduct as well, including, for example, being questioned by a government agent who told him that he could not speak to his attorneys post-arrest, despite the agent clearly having been informed that Mr. Alshdaifat was represented. Although we may lack standing to complain on his behalf, his treatment is a further indication that the government proceeded indiscriminately to violate its obligations in serious ways.

constitutes the specified unlawful activity allegedly promoted. That is the very duplication disallowed in money laundering decisions.

As has been held in this district "[b]ecause by definition, money laundering involves the proceeds of unlawful activity, it is well settled that the transaction charged as money laundering cannot be the same transaction through which the funds became tainted by crime." *United States v. Shellef*, 732 F. Supp. 42, 88 (E.D.N.Y. 2010). This well established principle relates to the impermissible "merger" problem identified in *United States v. Santos*, 553 U.S. 507 (2008), where a plurality of the United States Supreme Court noted that the money laundering provision at issue there had to be construed in a way that would not allow the conduct of the predicate crime to be the sole basis for the money laundering crime. *Id.* at 516-17. As the Supreme Court plurality observed, the money laundering statute could not be construed in a way that would cause a defendant who committed acts that "Congress evidently decided … deserve up to 5 years of imprisonment [under] § 1955(a)" to face exposure of "an additional 20 years" when "the government offered 'no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence of that crime.'" *See Gotti v. United States*, 2009 U.S. Dist. LEXIS 6018, at *9 (E.D.N.Y. Jan. 28, 2009) (the merger problem existed in *Santos* because the "defendant's payments to his employees and winning bettors were … necessary transactions for someone running an illegal gambling operation … [so] money laundering would have made the same conduct constitute both illegal gambling and money laundering").[13]

---

[13]     Distinguishing the *Shellef-Santos* principle from the case before it, the *Gotti* Court held that a money laundering conviction did not pose a merger problem because a tribute payment to the head of an organized crime family "was not the same conduct as the extortion and illegal gambling operations from which those payments were derived." *Id.* at *9.

Although the money laundering charges in *Shellef* and *Santos* proceeded under a prong of the money laundering statute different from the prong utilized here (the transaction prong, § 1956(a)(1), as opposed to the transportation prong, § 1956(a)(2)), the merger prohibition retains its vitality in both contexts. For instance, as noted in *United States v. Trejo*, 610 F. 3d 308, 318 (5th Cir. 2010), "Section 1956(a)(2)(A) contains an identical specific intent requirement for transportation cases as its § 1956(a)(1)(A)(i) transaction counterpart," which requires "some additional evidence beyond the bare transaction or transportation itself," and "squares with the broader premise that the money laundering statute was directed toward conduct that is distinct from the underlying substantive crime." *Id.* at 313-14, 316. *See also United States v. Swartzendruber*, 2009 U.S. Dist. LEXIS 19407, at *5 (D.N.D. Feb. 25, 2009) ("Congress directed § 1956[(a)(2)(A)] at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior specified unlawful activity"). *Cf. United States v. Aguilera-Meza*, 329 Fed. Appx. 825, 830 (10th Cir. 2009) (by contrast, finding no merger problem under § 1956(a)(2)(A) because the "underlying crime, drug trafficking, was separate from the crimes of unlicensed money transmitting affecting interstate or foreign commerce and money laundering").

This principle negates the charge here. According to the indictment, Mr. Lewis's payment to Mr. Khouli – which is the basis of the money laundering charge against him – is exactly the same conduct as the crime that is the predicate for the money laundering charge: deceitful importation. Indeed, Mr. Lewis's payment of money abroad is the *only* overt act in the indictment attributed to Mr. Lewis in the importation conspiracy.[14]

---

[14]     *United States v. Skinner*, 946 F. 2d 176 (2d Cir. 1991) does not change this result for two reasons. First, *Skinner* was issued before the Supreme Court's plurality in *Santos* – and after *Santos*, courts in this district have consistently held that a money laundering charge must be predicated on conduct that is distinct from the underlying crime. *See, e.g., Shelleff* and *Gotti*. Second, the payment in *Skinner* was for

Accordingly, the merger prohibition bars the government from charging Mr. Lewis with money laundering.

## IV.

### COUNT 7 MUST BE DISMISSED BECAUSE VENUE DOES NOT LIE IN THIS DISTRICT

Exemplifying its effort to improperly stretch the case against Mr. Lewis, the government charged a count that was indisputably venued in the District of New Jersey.

Pursuant to the Federal Rules of Criminal Procedure, the government is required to "prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18. With respect to the crime of fraudulent importation, 18 U.S.C. § 3237(a) provides that "any offense involving . . . the importation of an object or person into the United States is a continuing offense, and . . . may be inquired of and prosecuted in any district from, through, or into which such . . . imported object or person moves." *Id.* Thus, venue for a charge of illegal importation is proper in any location where an illegally imported object enters the country or is brought by the importer. *Cf. United States v. Lawson*, 377 Fed. Appx. 712, 716 (9th Cir. 2010).

Here, the allegedly illegally imported items that are the subject of Count 7 of the indictment – a "middle coffin and part of outer lid of nesting Egyptian coffin set" – were seized by government officials at the Port of Newark in Newark, New Jersey. The alleged conspirators never brought these items into the Eastern District of New York. In fact, both the discovery materials and the statements by the United States Attorney's office in its most recent press

---

drugs – items that are *per se* illegal to possess. So one payment to purchase drugs made it possible for the seller to buy additional drugs to sell and thereby commit future crimes. In our matter, even if a payment for an antiquity makes it possible for the seller to sell additional antiquities, the present purchase and subsequent purchase of antiquities are not illegal acts. So the payment for one does not fuel a subsequent illegal transaction.

release (roughly a week ago) provide confirmation from the government itself that the item in Count 7 was smuggled and seized in Newark. *See* Tab 7d.

Thus, there is no basis for this crime to be prosecuted in this District and Count 7 should be dismissed.

## V.

## THE COURT SHOULD CONDUCT AN IN CAMERA INSPECTION OF THE GRAND JURY MINUTES

Although we recognize that inspection of grand jury minutes is not favored, Rule 6(e) does provide for it where, as here, documented misconduct so strongly indicates that the government likely prejudiced the grand jury. Here, as discussed, the government has, at every turn, wrongly and unfairly portrayed Mr. Lewis as a participant in a long standing, international network to steal and smuggle the cultural patrimony of Egypt. This is the theme repeatedly trumpeted by the government in its public descriptions of this case; it is the theme repeatedly insinuated by the government in its sworn applications for search warrants. Rarely does the public record so clearly indicate that the government embarked on a campaign to indict on factual predicates that simply did not exist.

If, upon review, the grand jury minutes reflect this misguided effort, Mr. Lewis will seek to dismiss the indictment on this additional ground as well.[15] As the United States Supreme Court made clear in *Bank of Nova Scotia v. United States*, 487 U.S. 250, 259 (1988), a

---

[15]    Mr. Lewis's bill of particulars motion is pending before Magistrate Judge Gold. One of the particulars sought pertains to the indictment's use of the phrase "protected antiquities" to describe the Egyptian antiquities that are the subject of the indictment: "In what way any of the antiquities in question were "protected antiquities" [Indictment, paragraph 13]; otherwise, the defense is left to guess what statute, regulation or other provision they are accused of violating in addition to the statutes cited." *See* Tab 11 (Bill of Particulars Motion at 7). If any information that is ultimately provided in response to this request reveals that "protected" is used colloquially and does not reference a statute or the like, Mr. Lewis will also move to strike the word "protected" as prejudicial surplusage. In addition, with Mr. Khouli's recent plea, we assume that the government will dismiss charges from the indictment that pertain exclusively to him.

trial court can utilize its supervisory power to dismiss an indictment where government misconduct "is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process," including where misconduct "otherwise may have influenced the grand jury's decision to indict," or "there is grave doubt whether the decision to indict was so influenced."

Finally, with respect to the substantive charges in this case (Counts 3-7, all of which are based on 18 U.S.C. §545), we share this Court's concern over the fact that the government has charged both paragraphs of the statute, which duplicate each other or delineate separate crimes.[16]  In light of the confusion introduced by the government – confusion that the government did not dispel in its response to this Court's questions at Morris Khouli's plea – there is ample reason to question whether the grand jury was adequately instructed and, if not, voted to indict without the requisite majority.[17]  If it turns out that the government has used these separate statutory paragraphs to charge precisely the same conduct (something we hope to learn from our motion for a bill of particulars), then one paragraph should be eliminated as surplusage; if two different crimes have been charged, other motions may be appropriate, including a motion for a special verdict sheet or a motion for more serious relief.

---

[16]     The Court observed at Mr. Khouli's plea: "how many crimes have you charged in this count? This is all one crime? I mean, are they different crimes? …. And the government has a complicated Count 6 by charging essentially two crimes…." Khouli Plea Transcript (April 18. 2012), pp. 6, 8.

[17]     At the plea, the government noted that "Count 6 is one instance of smuggling, one substantive smuggling charge out of the smuggling charges and the scheme charged by the government…. The way that Section 545 is structured, there are two paragraphs…. Each of them acts independently to create a basis for a criminal charge."  When the Court asked "technically, you could have charged this as two crimes; is that it?" the government answered: "That's correct and that has been done in other indictments." *Id.*

## CONCLUSION

For the above reasons, defendant Joseph Lewis respectfully requests that the indictment against him be dismissed.  Alternatively, he requests that the materials seized from his email account and home be suppressed, that the money laundering count be dismissed, that Count 7 be dismissed, and that the minutes of the grand jury be inspected.  Finally, Mr. Lewis joins in the motions of co-defendant Salem Alshdaifat to the extent they apply to him, including Mr. Alshdaifat's motions challenging the application of 18 U.S.C. §§ 371 and 545 to the facts of this case, his motion to dismiss Counts 4 and 6 for lack of venue, and his motion for advance notice of 404(b) evidence.

Respectfully submitted,

Peter A. Chavkin, Esq.
Bridget M. Rohde, Esq.
Mintz, Levin, Cohn, Ferris,
Glovsky and Popeo, P.C.
666 Third Avenue
New York, NY  10017

For the Defendant
Joseph A. Lewis, II

Of Counsel.
Toby Vick, Esq.
Scott A. Rader, Esq.

36

6380506v.1